Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 1 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                                    1—4

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
                    OF FLORIDA
 2

 3

 4

 5

 6

 7   SHERVIN FULFORD,

 8             Plaintiff,

 9   vs.

10   MIAMI-DADE COUNTY,

11             Defendant.

12   _____

13

14        DEPOSITION OF MARYDELL GUEVARA

15              Pages: 1-161

16

17          Friday, August 5th, 2016

             1:00 p.m.- 5:45 p.m.44

18      Esquire Deposition Solutions - Miami

              44 West Flagler Street

19                 14th Floor

              Miami, Florida 33130

20

21

22

        Stenographically Reported By:

23          STACY A. BOFFMAN

24

25
```

## Page 3

```
 1              INDEX OF PROCEEDINGS

 2   Deposition of MARYDELL GUEVARA       Page

 3   Direct Examination by Mr. Storch.......3

     Cross Examination by Ms. Mosely........154

 4   Certificate of Oath....................160

     Certificate of Reporter...............161

 5

 6

 7

 8

 9        (EXHIBITS RETAINED BY COUNSEL)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 2

```
 1              APPEARANCES

 2

     On behalf of the Plaintiff:

 3   RICHARD B CELLER LEGAL- DAVIE

     7450 GRIFFIN ROAD, SUITE 230

 4   DAVIE, FLORIDA 33314

     BY: NOAH STORCH, ESQUIRE

 5

 6

 7   On behalf of the Defendant:

     MIAMI-DADE COUNTY

 8   BY: JOANIE MOSELY, ESQUIRE,

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1       Deposition taken before Stacy A. Boffman,

 2  Florida Reporter and Notary Public in and for

 3  the State of Florida at Large, in the above

 4  cause.

 5       - - - - - - -

 6       THE COURT REPORTER:  Do you swear or

 7  affirm the testimony you give today will be the

 8  truth, the whole truth, and nothing but the

 9  truth?

10       THE WITNESS:  Yes.

11  THEREUPON,

12            MARYDELL GUEVARA

13  having been first duly sworn, was examined and

14  testified as follows:

15            DIRECT EXAMINATION

16

17  BY MR. STORCH:

18     Q.  Good afternoon, Ms. Guevara.  Could you

19  please state your name and spell your last name?

20     A.  Sure.  Marydell Guevara, G-U-E-V-A-R-A.

21     Q.  Thank you.  My name is Noah Storch, and I

22  represent Mr. Fulford in this case.

23     Can you tell me are you currently employed by

24  Miami-Dade Corrections?

25     A.  No.  I'm not.  I'm retired.
```



MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                              5–8

Page 5

1   Q.  Wow.  That's wonderful.  One day I'll get
2 there.  Hopefully when I win the Powerball.
3   When did you retire?
4   A.  May 31st of this year, 2016.
5   Q.  And can you tell me when -- give me a
6 little bit of background about your employment
7 with Miami-Dade Corrections.  When did you first
8 become employed by them?
9   A.  I became employed June of 1983.
10   Q.  Okay.  In what capacity?
11   A.  I started as a correctional officer, and
12 through the years I came up the ranks.  I was a
13 correctional corporal, correction sergeant and
14 correctional lieutenant and correctional
15 captain.  And then I was appointed to deputy
16 director.
17   Q.  Got it.  When were you appointed to
18 deputy director?
19   A.  I believe -- approximately -- it may have
20 been around July of 2014.
21   Q.  Who appointed you to deputy director?
22   A.  It was then Director Charles McCray.
23   Q.  Got it.  And as deputy director, what are
24 your -- what were your responsibilities?
25   A.  The duties included overseeing the entire

Page 6

1 department, acting in the position when the
2 director was out.  Pretty much daily operations.
3   Q.  Got it.  When the director -- you said
4 when the director was out -- is that the only
5 person that you were, I guess, I'll call it
6 reporting to?
7   A.  Yes, sir.
8   Q.  The director is the highest position
9 within Corrections?
10   A.  That is correct.
11   Q.  Okay.  How many directors were there
12 during your time as deputy director?
13   A.  It was Charles McCray, and one interim,
14 which was Leonard Burgess and then Director Tim
15 Ryan.
16   Q.  When did Tim Ryan become director?
17   A.  I'll try to recall the dates.  I don't
18 know.  Retirement has kind of swiped my slate
19 clean here.  I believe he came on board --
20 approximately, I believe, December of 2005.  It
21 was around there.
22   Q.  Okay.  And you said that when he was --
23 or when any director was not there, you were
24 basically the one in charge, correct?
25   A.  That is correct.  Now, at one point there

Page 7

1 was a change.  They removed the deputy
2 director's position and downgraded it to
3 assistant director.
4   Q.  Okay.
5   A.  So as an assistant director there was
6 three or four of us.  And so if the director was
7 absent, it would rotate.
8   Q.  Let me ask you this question.  When you
9 say it would rotate, would it be whatever
10 assistant director was on that day, or were all
11 three, or four assistant directors working at
12 the same time?
13   A.  All of us would work at the same time.
14 So it would depend on who was most available and
15 who the director felt he wanted to leave as
16 acting director at the time.
17   Q.  Okay.  So when the director would leave,
18 would he say, okay, Assistant Director Guevara,
19 you're the one in charge while I'm out for this
20 period of time until I come back?
21   A.  Yes.  And there would actually be
22 memorandums written for everyone was aware who
23 was in charge.
24   Q.  Got it.  Do you know why you are here for
25 deposition today?

Page 8

1   A.  I have an idea.  Yes.
2   Q.  Sure.  Can you tell me why?
3   A.  I know there's a case that Mr. Fulford
4 had going.  So I believe it's related to that
5 case.  I haven't had the opportunity to look at
6 anything.  Being retired, I haven't been
7 involved in pretty much anything.
8   Q.  That's wonderful.
9   A.  It is.
10   Q.  You are making me jealous.
11   So let's talk about Mr. Fulford before
12 these -- before March of 2009.  So we can say up
13 until March of 2009.
14   Were you familiar with Mr. Fulford's
15 employment up until?
16   A.  Specifically, no, sir.
17   Q.  Okay.  Would have been familiar with
18 Mr. Fulford's employment had he had disciplinary
19 issues, or anything of the like, up until March
20 of 2009?
21   A.  It depends on what level of discipline.
22 The discipline that would get to my level at the
23 time would have to be 10-day suspension or
24 greater.  Anything below that would not call my
25 attention.



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 3 of 41

MARYDELL GUEVARA                                     August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                              9–12

Page 9

1    Q. So it's fair to say that Mr. Fulford did
2 not have a 10-day or greater suspension up until
3 March of 2009?
4    A. I wouldn't be able to recall. I know I
5 didn't recognize him until then.
6    Q. Okay. Do you know if Mr. Fulford
7 received positive or negative evaluations up
8 until March of 2009?
9    A. I don't recall.
10   Q. Okay. What is the Department's
11 procedure for handling allegations of sexual
12 harassment?
13   A. If -- it could go several ways. If an
14 employee wants to make an allegation regarding
15 sexual harassment they have a right to tell
16 their direct supervisor, or they could go
17 outside of the department to the EEOC.
18    If they go to their supervisor,  that
19 supervisor would then direct the person to go to
20 internal affairs, or we actually had a fair
21 employment practice individual that was over
22 that area. And they would also be directed to
23 that person, who would then listen to the
24 individual, or any other persons they wanted to
25 identify as witnesses, and who they determined,

Page 10

1 if there was a sufficient issue. And then
2 direct them to internal affairs. So there's
3 multiple avenues. If the person was to go
4 outside, we would not be aware until the EEOC
5 contacted as and then we connect them with
6 internal affairs.
7    Q. Understood. Can an employee both go to
8 IA, internal affairs, and to the EEOC at the
9 same time?
10   A. They can. Once the EEOC contacts us,
11 then there has to be a determination of who's
12 going to take the lead. You don't want to, you
13 know, interfere with each others review of the
14 case.
15   Q. Got it .  So Mr. Fulford, and -- well,
16 let me ask you this:
17    How did you become aware of some sort of
18 allegations against Mr. Fulford?
19   A. I believe his case went to internal
20 affairs, and an investigations was completed.
21 And then it went through what's called the
22 disposition panel.
23   Q. Okay. So let me ask you this question --
24   A. Uh-huh.
25   Q. The case going to internal affairs, do

Page 11

1 you know how that got started?
2    A. I don't recall if it was directed by an
3 outside party, or if the individual actually
4 went directly to internal affairs. I don't
5 recall.
6    Q. Understood. When internal affairs gets a
7 complaint, what is the procedure for sexual
8 harassment?
9    A. They would -- as in any complaint that
10 they get, they will investigate it fully. They
11 will fact find and go talk to any witnesses that
12 have been identified, pull any information they
13 can. And then they would bring the person in
14 who the allegation has been made against and
15 actually question them.
16   Q. Got it. So in this case, with regard to
17 Mr. Fulford, there was some allegations of
18 sexual harassment that were made against him in
19 March of 2009.
20    Does that sound accurate?
21   A. Yes.
22   Q. Shortly thereafter -- well, let me ask
23 you this:
24    You stated you don't recall how it got
25 started. Meaning, you don't recall if the

Page 12

1 complainant went to IA, or if it was outside
2 that prompted IA?
3    A. Right. That's correct. I don't recall.
4    Q. At the end of March, or March 26th, 2009,
5 I have a document that I'm going to show you.
6 It's a letter or a memorandum from you regarding
7 a temporary transfer assignment with regard to
8 Mr. Fulford.
9    Could you take a look at this document for
10 me. I'll show it to your lawyer first.
11   A. Okay.
12   Q. Are you familiar?
13   A. Yes.
14   Q. Okay. And I'll give it back to you.
15    According to this memorandum, Mr. Fulford was
16 given a temporary transfer assignment, effective
17 March 26th, 2009.
18    Where he was specifically -- on a temporary
19 basis, transferred to one facility -- the
20 Pretrial Detention Center. And he was given
21 a -- he was given specific shifts.
22    It says until further notice, Sergeant
23 Fulford is restricted to a list of assignments.
24    Do you see where it says that?
25   A. Yes.



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 4 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                              13–16

Page 13

1   Q.  Okay.  Is that proper procedure to
2  restrict an employee to a certain facility, and
3  to a specific shift, when there are allegations,
4  such as those that are made of Mr. Fulford?
5   A.  Yes.
6   Q.  Okay.  Where are those procedures
7  document?
8   A.  It's not necessarily a documented
9  procedure.  But it is to protect the integrity
10  of an investigation.  So if you have any kind of
11  allegations against someone, specifically,
12  sexual harassment, you need to remove the
13  alleged, accused person, and the alleged
14  complainant.
15   Q.  Was Ms. Christian -- was she removed from
16  the facility, as well?
17   A.  No.
18   Q.  So then it's only the --
19   A.  The alleged.
20   Q.  -- the alleged harasser that's moved?
21   A.  Yes.  That's correct.
22   Q.  Is there --
23   A.  No.  I was going to say -- and, again --
24  excuse me.  Because I'm in retired mode.
25   I believe we do have some procedures that may

Page 14

1  outline that in department standard operating
2  procedures regarding sexual harassment about
3  separating.
4   Q.  Certainly.  Why, if you are going to
5  remove Mr. Fulford and put him in another
6  facility -- what is the basis for restricting
7  him to a specific shift?
8   A.  This is basically -- the assignment is to
9  the facility.  It's not necessarily the shift.
10  And he was moved to the Turner Guilford Knight
11  -- when you said pretrial.  He actually left the
12  Pretrial for Turner Guilford Knight.
13   Q.  My apologies.  It looks like here that he
14  was given a specific shift.  The 6:30 a.m. Until
15  2:30 a.m shift, at TGK; is that correct?
16   A.  Correct.  And the reason that is, because
17  he was on day shift at the Pretrial Detention
18  Center.  So part of it is -- you want to move
19  somebody and keep them on the same shift.  You
20  want to be as minimally destructive as possible
21  to that individual.
22   Q.  While he was at the Pretrial Detention
23  Center, was he able to twitch switch shifts or
24  change shifts, if he needed to?
25   A.  No.  They stay on the same shift for a

Page 15

1  six month bid.  So we don't change shifts when
2  you want to change.
3   Q.  And in all cases of sexual harassment
4  that have come across your desk, I guess,
5  because the severity of sexual harassment
6  allegations -- do they all come across your
7  desk?
8   A.  Again, I can't recall if all of them did.
9  Because depending on where I was -- if I wasn't
10  the assistant director of that chain, as the
11  deputy director they would have.  And depending
12  on the level of sexual harassment.
13   Q.  Got it.  So for the -- but would you
14  agree with me, that in all sexual harassment
15  cases, that initially the removal of the alleged
16  harasser is something that is done?
17   A.  It's pretty standard.  Unless you have
18  extenuating circumstances.
19   Q.  Understood.  Is it also, or would you
20  agree with me that all sexual harassers that are
21  moved, are specifically told that until further
22  notice they are being restricted to the listed
23  assignment in their temporary assignment memo?
24   A.  Yes.
25   Q.  Okay.  Was Marriett Dominguez (Phonetic)

Page 16

1  -- when she received her temporary transfer
2  memo, was she -- did it specifically state that
3  she was restricted to the listed assignment?
4   A.  I don't recall if it was.  She was moved.
5   Q.  Would there be any reason that she would
6  not have been restricted to the listed
7  assignment?
8   A.  Again, it depends on the circumstances.
9  She was over a bureau.  So the complaints were
10  from a particular bureau and not individuals.
11  It depends.  But she was restricted from working
12  that specific bureau.
13   Q.  So she was restricted from working --
14  when you say bureau, do you mean a specific
15  location?
16   A.  Correct.
17   Q.  But do you have any reason to believe
18  that she was not restricted to a specific shift,
19  as well?
20   A.  I don't recall.
21   Q.  Okay.  Based on the allegations of sexual
22  harassment against her, should she have been
23  restricted to the listed assignment?
24   A.  You know, it depends on the
25  circumstances.  Because you can have a sexual



Case 1:15-cv-23061-KMM  Document 51-4  Entered on FLSD Docket 09/12/2016  Page 5 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                       17–20

Page 17

1 harassment allegation that has multiple
2 witnesses, and IA's or EEOC, or what our FEP
3 person does is vets those and assess it. It
4 kind of gives you an idea of the severity of
5 what the allegations are.
6    Q.  And I understand that.  But the temporary
7 transfer assignment, doesn't that come before
8 the IA investigation?
9    A.  It comes after there's been a full
10 assessment of the allegation.
11    Q.  Explain that to me.  Because my
12 understanding is, that Mr. Fulford was
13 transferred to two days after the allegations
14 were made against him.
15    A.  Uh-huh.
16    Q.  So in that two days was IA able to do
17 their entire investigation?
18    A.  No.  They may have gotten a statement
19 from  someone that identified -- at least some
20 concern.  So if someone comes in and says: Hey,
21 Joe Blow sexually harassed me.  The person is
22 called in to give details.
23    Q.  When you say -- and I'm sorry for
24 interrupting you.
25    A.  Sure.

Page 18

1    Q.  When you say the person.  Just for
2 clarity of the record, can you say the harasser
3 or the victim?
4    A.  The victim.
5    Q.  Because when we read it back, I'll
6 forget.
7    A.  So the victim comes in and says:  Joe
8 Blow sexually harassed me.  And so the victim is
9 pretty much sent either to IA or they go to
10 EEOC.  There's some assessment to say when,
11 where.  If the victim can't say what location.
12 Or the victim says, oh, it was on some day last
13 year when I worked with Joe Blow, and there's
14 absolutely no evidence or proof that Joe Blow
15 ever worked that assignment, that takes on a
16 different connotation.
17    But, if you look at it, and the victim says
18 it was June 14th, at 2:00 p.m., at this site.
19 And you pull a rooster, and you find that Joe
20 Blow did work with the victim, now that gives us
21 something to go on.  Now, there's some basis to
22 the allegations.  And that's to protect, pretty
23 much the person being accused.  You want to make
24 sure that there's something that could've
25 possibly happened.

Page 19

1    Q.  Understood.  Ss the -- I'll call it the
2 initial review of the complaint is done pretty
3 quickly, so that you can determine, for example,
4 if Mike worked at the same time as Sally worked.
5 And if they did, then you're going to do a
6 temporary transfer to the harasser?
7    A.  Yes.
8    Q.  But the substance -- I'll call it -- the
9 allegations are not investigated at that time,
10 correct?
11    A.  That's correct.
12    Q.  Okay.  So if there was merit to the
13 allegations of sexual harassment, against
14 Ms. Dominguez, she should have been, or would
15 you agree with me, that she should have been
16 given a temporary transfer assignment, and
17 restricted to that listed assignment?
18    A.  Again, it depends on the circumstances.
19 And it could be something as well as it was not
20 put on the transfer order.
21    Q.  Why would something like that be kept off
22 a transfer order?
23    A.  It depends on who writes the transfer
24 order.  It's not a specific reason.  It could
25 have been just someone left it off of the

Page 20

1 transfer order.
2    Q.  Understood.  You wrote the transfer order
3 that I showed you for Mr. Fulford.
4    Do you know if you wrote the transfer order
5 for Ms. Dominguez?
6    A.  I don't recall.  I know I signed the
7 transfer order.  I don't write it.  I sign them.
8    Q.  Okay.  But would there have been any
9 reason that she would not have been restricted,
10 if there was substance to her sexual harassment
11 allegations?
12    A.  None that I recall.
13    Q.  So then, again, going through the
14 process, because it's all new to me.
15    A.  Uh-huh.
16    Q.  Once the temporary transfer assignment is
17 made, and the alleged victim and the accused
18 harasser are in essence split up, what is the
19 next step procedurally?
20    A.  The internal affairs bureau proceeds with
21 our full investigation.
22    Q.  Got it.  So internal affairs -- you
23 can strike that.
24    My understanding is, that Sheba Boom
25 (phonetic) conducted the internal affairs



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 6 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                           21–24

Page 21

1  investigation into the allegations against
2  Mr. Fulford; is that correct?
3      A.  I don't recall.  But it should say it
4  there.
5      Q.  So this document is dated July 13th,
6  2009.
7      Case No. 107-IA-22PTDC-09.  It says from,
8  Sheba Boom (phonetic), Sergeant, Internal
9  Affairs Unit.
10     Can you just tell me if that's correct?
11     A.  That is correct.
12     Q.  Perfect.  So that would mean that Sheba
13  Boom conducted the IA investigation into
14  Mr. Fulford's -- the allegations against
15  Mr. Fulford?
16     A.  That identifies it's there.  Yes.
17     Q.  Okay.  And we will get into the specifics
18  of it all.  But, again, I just want to kind of
19  keep it to the process.  So IA, by way of Sheba
20  Boom, in this case does an investigation.
21     What does that investigation entail?
22     A.  It would entail -- pretty much
23  interviewing anyone that's identified as a
24  witness, fact finding, gathering of the fact.
25  And then in the end, calling in the subject,

Page 22

1  interviewing them and laying out what was found
2  in that investigation.
3      Q.  Is the alleged harasser -- in this case,
4  Mr. Fulford, is he -- is it protocol to call him
5  in last after all of the witness statements, or
6  is it just way of scheduling who's available?
7      A.  No.  They usually will call the person in
8  last.  Unless something else comes up new.
9  Usually the subject person is called in last.
10     Q.  Understood.  After all the witnesses
11  state -- oh, let me ask you a question about the
12  witness statements.
13     Are the witness statements captured in any
14  type of way?
15     Meaning, is there a video camera?  Is there
16  a recording?  Is there a court reporter?  Or is
17  it just -- in this case, Ms. Boom calling in,
18  you know, Michelle Smith and talking, and then
19  just memorializing what was told to her?
20     A.  No.  Usually there's an actual audio
21  tape, and, or a stenographer present.
22     Q.  Understood.  Do you know if the audio
23  tapes, and or, stenographer, if those records
24  are kept?
25     A.  They should be kept.  Yes.

Page 23

1      Q.  Okay.  Let's go off the record for a
2  second.
3      (OFF THE RECORD AT 1:39 P.M)
4      (BACK ON THE RECORD AT 1:39 P.M.)
5  BY MR. STORCH:
6      Q.  So the -- does Ms. boom, at the end of
7  her investigation make any recommendation as
8  to -- I believe the allegations have merit?  I
9  don't believe the allegations have merit?
10     A.  No.
11     Q.  So the --
12     A.  That's not the standard.
13     Q.  So Ms. boom has absolutely no -- I'll
14  call it authority, to make recommendations.  Her
15  job -- and correct me if I'm wrong.  It would be
16  to interview witnesses, including the alleged
17  harasser and the alleged complaint, put together
18  a document of what she's told, and then that
19  document gets -- goes to the next part of the
20  chain, correct?
21     A.  As the investigator would do the fact
22  finding.  There have been times where there can
23  make a recommendation not related to the
24  allegations against the person.  But if
25  something continues to come up related to --

Page 24

1  let's say a policy of interviewing multiple
2  folks they found out the individuals weren't
3  following certain policies, or the door wasn't
4  being kept closed, then they want to make a
5  recommendation for that facility supervisor to
6  say -- review the policy of staff recommended.
7  It's nothing related to the allegations.
8      Q.  It's nothing related to the
9  investigations?
10     A.  Correct.
11     Q.  So if anything -- it would just be, hey,
12  this door is opening, and we're Miami, not
13  Broward.  We don't want anyone to run out of
14  jail?
15     A.  Correct.  Not nice.
16     Q.  Okay.  Miami.  Not Broward.
17     Okay.  Ms. Boom does the IA investigation.
18  Who does she send the document to?
19     A.  The complete IA investigation would then
20  go to -- and it's changed.  But the actual
21  process has changed over the years.
22     Q.  So let's talk about at that time in July
23  of 2009?
24     A.  To the best of my recollection.  I would
25  have to through that out.



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016

25—28

Page 25

1   Q.  Sure.
2   A.  It would either go to -- most likely it
3   would go to the labor management unit.
4   Q.  Okay.
5   A.  Who would then distribute it.  They would
6   receive the actual case, and then they would
7   distribute it to -- they would log it in, and
8   then they would distribute it to that respective
9   persons chain of command.  No.  I'm sorry.  Stop.
10  Reverse.  They would log it in and it would
11  actually go to the disposition panel that's been
12  identified.
13  Q.  Okay.  Let me ask you this question.  As
14  far as the labor management unit.  And you --
15  saying that once labor management gets the
16  investigation, they distribute it to the
17  disposition panel.  So correct me if I'm wrong,
18  just by understanding your statement, labor
19  management is not leading the investigation to
20  make any recommendations, or are they leading?
21  A.  No.  At that time they do not read it.
22  It simply goes -- and it may not be a stopping
23  point.  It may have gone straight to the
24  disposition panel.
25      Again, we've changed the process.  But it

Page 26

1   would go to the disposition panel, who's the
2   first group that gets it and goes through the
3   file.
4   Q.  Understood.  So to the best of your
5   recollection, if it does -- if the investigation
6   did go to the labor management unit, it would
7   essentially just be a pass-through?
8   A.  Pass-through.  Yes, sir.
9   Q.  Okay.  I assume that that process is
10  probably pretty quick if it's just a
11  pass-through from labor management to the
12  disposition panel; is that correct?
13  A.  That's correct.
14  Q.  Okay.  So generally -- and I know --
15  correct me if I'm wrong, some cases take longer
16  than others; is that correct?
17  A.  That is correct.
18  Q.  The -- from the time the investigation is
19  completed by IA, until the time that it goes to
20  labor management and then to the disposition
21  panel, that time should be relatively short?
22  A.  That's correct.
23  Q.  Okay.  By the way, does anyone -- before
24  the disposition panel gets the investigation --
25  does anyone look over Ms. Boom's -- in this

Page 27

1   case, investigation?
2   A.  From a technical, numerical-type of
3   review, it would go through the IA's chain of
4   command.  So the investigator would give it to
5   their lieutenant, and or captain for review of
6   the file, the structure of the file, grammatical
7   errors, or anything that they felt may have been
8   left off, or anything they feel needs to be
9   included and they direct us back to that
10  investigator.  So that investigator has a chain
11  of command.
12  Q.  Understood.  Do those individuals -- that
13  chain of command -- do they get the audio tapes
14  or the transcripts of the interviews?
15  A.  Everything is included in that file.
16  Q.  Okay.  So when they get it -- meaning,
17  the chain of command, they are -- they have
18  access to everything that Ms. Boom, in this
19  case, had access to in preparing the report?
20  A.  That is correct.
21  Q.  Understood.  And we'll get back to that
22  in a second.
23      Can you tell me -- because we were talking
24  about from sergeant -- from lieutenant to
25  captain.

Page 28

1       Can you tell me the ranking?  I guess, it
2   starts with an officer?
3   A.  The CO.  Yes.  An officer, corporal,
4   sergeant, lieutenant, captain, and actually
5   captain on up are all appointed positions.  So
6   you have a captain.  You have a chief.  You have
7   an assistant director.  And you have the
8   director.  Officer through lieutenant is all
9   classified service.  Captain and up are
10  appointed positions.
11  Q.  Understood.  I understood -- I guess,
12  officers, corporals, sergeant, lieutenant, take
13  a test -- or do your time, so to speak.  Take a
14  test.  Move on up.  You can't move on up anymore
15  until you're appointed?
16  A.  That's correct.
17  Q.  Who appoints the captains?
18  A.  The director.
19  Q.  Who appoints the chief?
20  A.  The director.
21  Q.  Who appoints the assistant director?
22  A.  The director.
23  Q.  Who appoints the director?
24  A.  The mayor's office.
25  Q.  Got it.  Does the mayor's office have

MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
29–32

Page 29

1 anything to do with the appointment of captain,
2 chief or assistant director?
3    A.  No.
4    Q.  Okay.  Assistant director, that is what
5 you said also was deputy director?
6    A.  Yes.  Assistant director, and deputy
7 director -- I'm sorry.  That went away.  But,
8 yes.
9    Q.  Okay.  So in -- starting March of 2009,
10 it was deputy director or assistant director?
11    A.  I would have to look.  I really don't
12 remember when they transitioned it.
13    Q.  Got it.  But the transition was from
14 deputy director to assistant director?
15    A.  Yes.
16    Q.  Understood.  And it's assistant director
17 now?
18    A.  Yes.
19    Q.  Okay.  So back to the distribution to the
20 disposition panel.
21    A.  Yes.
22    Q.  How is it determined -- let me ask you
23 this; who -- how many people are on the
24 disposition panel?
25    A.  Three.

Page 30

1    Q.  Is it the same three people that get all
2 of the IA investigations, or is it -- are there
3 fifteen people and three are assigned to each
4 case?
5    A.  There's approximately, between six to
6 eight disposition panelist.  They each have
7 three.
8    Q.  Okay.
9    A.  And it's rotated -- I believe, it's
10 rotated -- I believe, every six months.  You try
11 to identify a chief position to chair, the
12 disposition panel.  And then you have captains.
13 And you also have alternates identified.
14    Q.  And I guess, correct me if I'm wrong, an
15 alternate would be if -- well, let me ask you
16 this; what happens if someone is on a
17 disposition panel, that used to be the
18 supervisor of the alleged harasser or the
19 alleged victim?
20    Would that person be removed and an alternate
21 is put in?
22    A.  Being a supervisor, depending on how long
23 ago it was, it wouldn't really be an issue.  It
24 might be an issue if the person knew someone was
25 friends with the individual or had problems with

Page 31

1 the individual that were known.  That might be
2 an issue.  But being a supervisor wouldn't
3 necessarily remove you.
4    Q.  And when the IA investigation is sent to
5 the disposition panel, is it on, like, a
6 rotation?
7    Meaning, okay, one investigation came in and
8 it goes to first.  The second one came in and it
9 goes to the second disposition and so forth?
10 Is that how it works?
11    A.  Yes.  I believe internal affairs tries to
12 keep balance so they won't overwhelm one panel
13 more than the other.
14    Q.  Understood.  So in this case it looks
15 like the -- well, we will talk specifics after.
16 The disposition panel, what do they do?
17    A.  They look at the case, and they look
18 through the allegations.  And they make a
19 determination of recommending whether the
20 allegations should be sustained, not sustained,
21 exonerated.  Yeah.
22    Q.  Got it.  And --
23    A.  Or unfounded.
24    Q.  And do all three members have to agree on
25 the outcome of each allegation?

Page 32

1    A.  No, they don't.  If there's a descending
2 party, that party has to actually write why
3 they're descending.
4    Q.  Got it.  What happens if two people say
5 not sustained, and one person says sustained?
6 Is it a majority rules?
7    A.  Yes.
8    Q.  Okay.  That recommendation -- from those
9 -- that three person disposition panel, where
10 does that go?
11    A.  Once a disposition panel has identified
12 their findings -- their recommended findings,
13 then it go to the individuals respective chain
14 of command.  And it goes through each level of
15 that chain of command.  With the responsibility
16 for each of those individuals to look at the
17 case.  Look at recommended findings, and either
18 agree, or not agree.  And, again, if they decent
19 from what's being recommended, to support with a
20 memorandum.
21    Q.  Understood.  The disposition panel, they
22 draft a document that says sustained or not
23 sustained, correct?
24    A.  That is correct.
25    Q.  Do you know if that goes to labor



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 9 of 41

MARYDELL GUEVARA                                        August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                                    33–36

Page 33

1  management before it goes up the chain of
2  command?
3    A.  I'm trying to think again with the
4  process.  Once the disposition panel drafts up
5  the document, yes.  It will go to labor
6  management.  And any sustained charges, they
7  will initiate the first steps of drafting up a
8  charging document.
9    Q.  I'm sorry.  Can you say that one more
10  time?
11    A.  It goes to labor management, and labor
12  management may start initiating a charging
13  document.
14    Q.  And that would be -- is that a DAR, or is
15  that a pending disciplinary action memorandum?
16    A.  It would be a pending disciplinary action
17  memorandum.
18    Q.  Okay.  What is the purpose of the pending
19  disciplinary action memorandum?
20    A.  To make sure that we come in compliance
21  with the  Weaver date, which is 180 days.
22    Q.  The 180 days from the date that the
23  complaint is made; is that correct?
24    A.  Yes.  At that time that was it.
25  Subsequent to that, it was some law that changed

Page 34

1  it.  If an internal complaint, then it wouldn't
2  be held for the 180 days.  Back then we tried to
3  stick to 180 days.
4    Q.  Got it.  And that would mean that 180
5  days from the date of the complaint, until the
6  closure of the case where -- I'll call it any
7  decisions on discipline have been made?
8    A.  No.  It would be 180 days from the date
9  of the complaint, until the date that the
10  individual -- let's say, subject, employed, is
11  actually noticed in writing that there's pending
12  discipline.
13    Q.  Understood.  So the whole entire
14  investigation doesn't have to come to closure
15  with the decision with the 180, they just have
16  to -- the employee has to be notified of some
17  sort of investigation that's going on that could
18  lead to some sort of discipline?
19    A.  That's correct.
20    Q.  Who's in charge of drafting the
21  memorandums for pending disciplinary actions ?
22    A.  Labor management.
23    Q.  Are they required to advise the employee
24  of why there's an investigation taking place?
25    A.  No.  And let me just say at that time the

Page 35

1  employee would already know, because they have
2  been called into internal affairs.
3    Q.  Certainly.  The disposition panel makes
4  their recommendations.  Excuse me.  Labor
5  management may get the document before it goes
6  up the chain of command.
7    Who in the chain of command gets the case
8  first?
9    A.  It would we be the captain of that
10  individual's respective chain.  The captain of
11  the bureau.
12    Q.  The captain, is that the first time that
13  he or she is made aware of the case?
14    A.  That's the first time they actually have
15  the case.  Yes.
16    Q.  But is that the first time that they have
17  heard, in this case, Mr. Fulford, is that the
18  first time that captain would have heard that
19  there was allegations of sexual harassment
20  against Mr. Fulford, and there was an
21  investigation conducted?
22    A.  Not necessarily in a sexual harassment
23  case, because he was moved from that bureau,
24  they were probably informed that there was some
25  allegations made and who made them.

Page 36

1    Q.  Understood.  But the captain, up until
2  the point he or she gets the case, the documents
3  would not have had any opportunity to review any
4  documents associated with that?
5    A.  That's correct.
6    Q.  The captain -- does the whole chain of
7  command get all of documents at once, or is it
8  first stop at the captain, and then it goes to
9  the next person?
10    A.  It goes up the chain.  So you get a
11  pretty extensive file.  And we -- you know, we
12  really require individuals to take a look at it.
13  So captain, and then it would go to the chief,
14  and so forth and forth.
15    Q.  Understood.  So it's captain, then chief,
16  and then at that time it would've been --
17    A.  Assistant director or deputy.
18    Q.  And then the director?
19    A.  Yes.
20    Q.  And at any point up until the director
21  signs off recommendations are able to be made by
22  that chain of command?
23    A.  Every individual in the chain of command.
24  That's the expectation.
25    Q.  The recommendation, is that -- strike



MARYDELL GUEVARA                                      August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                             37–40

Page 37

1  that.
2      So in this case, I believe it was Linda
3  Edwards, that is the facility supervisor that
4  got the investigation first.  And she signed the
5  closure memorandum.  Is that what's put together
6  by the --
7      A.  Disposition panel.
8      Q.  Yes.
9      A.  Yes, sir.
10     Q.  She signed the closure memorandum on
11  August 28th, 2009; is that correct?
12     A.  Yes.  That's what it states there.
13     Q.  Okay.  The next signature, it looks like
14  Ms. Bendros (phonetic) signed on September 4th,
15  2009; is that correct?
16     A.  That's correct.
17     Q.  Okay.  And both of those individuals
18  approved the findings of the disposition panel?
19     A.  That's correct.
20     Q.  And you signed next on September 4th,
21  2009; is that correct?
22     A.  That's correct.
23     Q.  And you disapproved?
24     A.  That's correct.
25     Q.  And then on September 14th, 2009, Tim

Page 38

1  Ryan signed, correct?
2      A.  That's correct.
3      Q.  And he disapproved, as well?
4      A.  That's correct.
5      Q.  So just -- I guess, as a matter of clean
6  up -- so the attorney-client privilege doesn't
7  extend once the deposition is started and
8  ongoing.  So if it was something that was
9  personal for Ms. Guevara, you know, I don't want
10  to know.  But if it relates to the case, I'm
11  certainly entitled to know what you two spoke
12  about, because she's being deposed right now.
13  So there's no privileged between the two of you
14  while the deposition is ongoing.
15         MS. MOSELY:  I disagree with your
16  assessment of that.  And I'm going to invoke
17  attorney-client privilege.
18         MR. STORCH:  So then I'll just ask.
19  Ms. Guevara, were you discussing -- and I'm
20  not asking you what you were discussing.
21      Were you discussing information related to
22  this case to your attorney just now?
23         THE WITNESS:  I have to go to the
24  bathroom.
25         MR. STORCH:  Okay.  We can go off the

Page 39

1  record.
2          (OFF THE RECORD AT 2:00 P.M.)
3          (BACK ON THE RECORD AT 2:06 P.M.)
4  BY MR. STORCH:
5      Q.  Okay.  So I want to talk a little
6  about -- well, let me ask you this question:
7      Was Linda Edwards in Mr. Fulford's -- she was
8  his facility supervisor, correct?
9      A.  If it indicates it there -- I don't
10  recall that far back.  But if she signed as the
11  facility supervisor, then if her name is there
12  she may have been.
13     Q.  If she was the facility supervisor, would
14  there have been any reason to have her not on
15  the panel?
16     Meaning, not in that chain of command?
17     A.  On the disposition panel, or in the chain
18  of command?
19     Q.  In the chain of command.
20     A.  No.  You actually have to have that
21  person in the chain of command when the event
22  occurred.
23     Q.  Understood.  Let me ask you a little bit
24  about Tamara Key (phonetic), and her joy in the
25  labor management unit.

Page 40

1      What is her job in charge of labor
2  management?
3      A.  The lieutenant in labor management
4  basically runs the labor management unit and
5  makes sure it continues to run orderly.  They
6  receive and put together all department
7  discipline.  So they receive charging documents,
8  which are DAR's, or records of counseling.  They
9  look through it to make sure any drafts meet the
10  requirements, both format-wise, language,
11  grammar, as much as correct dates.  And they
12  communicate with the respective chain of
13  commands to make sure that the documents are
14  moving.
15     Q.  Understood.  Do you recall having any
16  conversations with Tamara Key, or anyone in
17  labor management while the investigation into
18  Mr. Fulford was ongoing?
19     A.  I can't recall that.  It would not be
20  unusual if there's a discipline matter that's
21  pending and actions coming close for them to
22  discuss it.
23     Q.  Understood.  So we'll talk the specifics
24  of the allegations and your memorandum to change
25  some findings from not sustained to sustained in



Page 41

1 a little.
2    What I want to talk about now is the DAR.
3 Disciplinary Action Report.
4    Is that -- that is the labor management's
5 responsibility to draft; is that correct?
6    A. For internal affairs, type cases they
7 would not draft it if it was an action that was
8 occurring from the facility or another bureau.
9    Q. What would be the difference?  Just so
10 I'm clear.
11    A. You have a supervisor that see's an
12 employee violate a rule.  That supervisor then
13 is responsible to draft up a charging document.
14 And that goes to labor management.
15    Q. Okay.  If there's some sort of
16 investigation that is started, then it would be
17 the labor management's unit responsibility to
18 draft a DAR.  But if a supervisor physically
19 witnesses one of his subordinates, or maybe
20 not -- maybe his supervisor is violating some
21 sort of policy, then it would be on that person
22 to draft the DAR and send it up?
23    A. That's right.
24    Q. Understood.  The DAR, with regard to an
25 IA investigation, is that drafted -- at what

Page 42

1 point is that drafted?
2    A. Again, depending on the timing of the
3 case.  Once labor management receives the
4 disposition findings, they may start initiating.
5 Because a charging documents related to an IA
6 case is a very simple document.  So and so --
7 the disposition panel met, and sustained the
8 following allegations.  So it's just -- pretty
9 much repeating the allegations that have been
10 sustained in that charging document.
11    Q. The DAR is the charging document?
12    A. Yes, sir.
13    Q. Okay.  So the DAR, that is -- that I'm
14 going to show you is dated August 10th, 2009.
15 I'm going to show this to your lawyer.
16    It's -- it actually came from the County.
17 It's numbers 32 and 33.
18    Just review the document, if you don't mind.
19 It's marked as No. 1.
20    Have you had an opportunity to review that
21 document?
22    A. Yes, I have.
23    Q. Great.  Can you tell me the date of this
24 disciplinary action report?
25    A. August 10th, 2009.

Page 43

1    Q. Okay.  At this point, had anybody in the
2 chain of command received the IA investigation?
3    A. I would have to refer to the disposition
4 in writing.
5    Q. Are you referring to the closure
6 memorandum?
7    A. Yes.
8    Q. And actually the IA case, as well?
9 There's two.
10    So I'm showing you the July 31st, 2009
11 closure memorandum.
12    A. Uh-huh.
13    Q. And that's Defendant's 16, 17, 18, and
14 19.
15    A. Okay.
16    Q. And the last page -- could you tell me --
17 Ms. Edwards, that is the first signature,
18 correct?
19    A. That's correct.
20    Q. And the date she signed it?
21    A. August 28th 2009.
22    Q. Okay.  So based on that, is it possible
23 that the IA -- excuse me.  Based on the August
24 28th date, is it possible that a final decision
25 had been made with regard to the IA

Page 44

1 investigation?
2    A. No.  A final decision was not made.
3 However, the disposition panel has sustained.
4 Their recommendation was to sustain.  So again,
5 based on weaver, labor management would initiate
6 knowing that there were some sustained findings.
7 It's easier to initiate, and then if the chain
8 fully disagrees the charging of the DAR is
9 rescinded.
10    Q. Understood.  So do you find it
11 interesting that this DAR is dated August 10th,
12 2009.  Yet it contains all of the findings that
13 you made in your September 4th, 2009 memorandum
14 changing the allegations from nonsustained to
15 sustained?
16    A. Do I find it interesting, no.  They
17 probably initiated it August 10th.  And then it
18 went on revised when they finally got the final
19 action.  And the date is the -- the date that it
20 was served to the employee.
21    Q. So according to Tamara Key --
22    A. Uh-huh.
23    Q. -- had she started a document, the DAR,
24 on August 10th 2009, as indicated, there would
25 be a separate document indicating that the --



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
45–48

Page 45

1  the fact section would  represent what was found
2  in the disposition panel's findings.
3     Do you know if there is a separate DAR, that
4  indicates what the findings of the disposition
5  panel was?
6     A. I do not.  I did not find it unusual for
7  there to be a date, and maybe someone had it on
8  the computer and wanted to revise it, and did
9  not do it properly one.  They wouldn't
10 necessarily have a separate document unless it
11 was served to the employee.  So if they
12 initially started on August 10th, with the
13 sustained findings of the disposition panel
14 already made, and served the employee, and then
15 something else came up, then they would have to
16 rescind the original one.  So they don't
17 necessarily always keep separate copies.
18    Q. Understood.  But it is accurate to say
19 that the facts in August 10th, 2009 DAR, are the
20 findings that you made in your September 9th,
21 2009 letter, correct?
22    A. I would have to look again, and go fact
23 by fact to compare to my letter to see.  But if
24 it was the charging document served -- the
25 original served to Mr. Fulford, then it would

Page 46

1  have to contain everything.
2     Q. Got it.  Is there any reason why a DAR
3  would be held in abeyance?
4     A. In general?
5     Q. Yeah.
6     A. There might be some reasons.
7     Q. Can you tell me what some of the reasons
8  are?
9     A. The employee was not available.  Issues
10 occurred in the processing of the actual
11 charging documents.  There would be extenuating
12 circumstances.  But --
13    Q. Got it.  At what point did you review the
14 IA document?
15    A. Again, I would have to look at -- not
16 necessarily the disposition panel.  But when I
17 would have received the case.  It was usually a
18 transmittal.
19    Q. So I'll show you the memorandum dated
20 September 4th, 2009.  That's from you to Tim
21 Ryan.  And go ahead and mark that as 2.
22    Is that the memorandum that you drafted and
23 sent to Director Ryan?
24    A. It appears to be.  Yes.
25    Q. Any reason to believe that it's not?

Page 47

1     A. No.
2     Q. Okay.  Can you tell me the date?
3     A. September 4th, 2009.
4     Q. And do you recall and in going through
5  your review of -- well, strike that.
6     So No. 3, is the memorandum dated July 31st,
7  2009.
8     And it's the disclosure memorandum.  I'll
9  have you look at that as well.
10    So Ms. Bendros, correct, the division chief?
11    A. Yes.
12    Q. She signed on what date?
13    A. September 4th, 2009.
14    Q. So is it fair to say, or is it accurate
15 to say that you would not have received the IA
16 case before September 4th, 2009?
17    A. Correct.
18    Q. You signed the closure memorandum on
19 September 4th, 2009; is that correct?
20    A. That's correct.
21    Q. There was a lot of stuff to review; is
22 that correct?
23    A. That's correct.
24    Q. You reviewed it all in one day?
25    A. No.

Page 48

1     Q. So is that September 4th, 2009 date, that
2  you signed the closure memorandum accurate?
3     A. It probably reflects when I started to
4  look at the case.  And given when Director Ryan
5  signed it on the 14th.
6     My initial review started on September 4th.
7     Q. Okay.  And then is it fair to say --
8  well, let me ask you this question:
9     A. Uh-huh.
10    Q. Approximately, when do you think you got
11 your September 4th 2009 memorandum that's
12 Exhibit 2, to Director Ryan?
13    A. Probably some time closer to the 14th.
14 And I just did not change.  This is when
15 initiated my review.
16    Q. Got it.  But the September 4th, 2009 date
17 on your memorandum, that is not the date that
18 the document was actually drafted?
19    A. I would have started it.  Because it has
20 that date, that would have been the date I
21 started it.  But it definitely was not reflected
22 when I completed the review.
23    Q. Okay.  The IA case that went up to
24 Director Ryan, do you recall how long he took to
25 sign off on your memorandum and closure



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 13 of 41

MARYDELL GUEVARA                                      August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                         49–52

Page 49

1 memorandum, which are both dated September 4th,
2 2009?
3   A. I don't know.
4   Q. Okay. So when you went through the
5 investigation by Ms. Boom -- I guess, we might
6 as well mark this as 4.
7   This is the July 13th, 2009 investigation.
8 It's pages 1 through -- if I could tell you the
9 last page, I would -- 55. And it's signed by
10 Sheba Boom.
11   Okay. We're good to go.
12   So we have marked this as Exhibit 4.
13   This is the July 13th investigation that was
14 completed by Ms. Boom. So let's kind of go
15 through the allegations.
16   A. Sure.
17   Q. If you don't mind?
18   A. There's one document that list them out.
19   Q. Yeah. I have that.
20   This is the disposition of allegations. It's
21 Defendant's eight through fifteen.
22   So there's various allegations that were made
23 by, or against Sergeant Fulford?
24   A. Yes.
25   Q. The first allegation is that Sergeant

Page 50

1 Shervin Fulford, badge number: 5488, made sexual
2 advances to Officer Christian; is that correct?
3   A. Yes.
4   Q. And you're looking at Exhibit 2.
5   Can you tell me what the disposition panel
6 found?
7   A. Yes. They sustained it.
8   Q. And can you tell me what your
9 recommendation was?
10   A. To sustain it.
11   Q. Can you tell me why?
12   A. Based on the preponderance of the
13 evidence that I found in the case. And directly
14 based on the other allegations that the actual
15 disposition panel found -- sustained -- actually
16 supported it.
17   Q. Can you tell me in going through all of
18 the allegations -- you said -- you testified
19 earlier that you reviewed all of the documents
20 -- all -- you listened to all of the tapes.
21   Did you find any inconsistencies of testimony
22 along the way?
23   A. I don't recall specifically right now. I
24 know that in any IA case they take it seriously.
25 So I listened to all of the audio tapes and

Page 51

1 looked at any transcripts or evidence before --
2 in the fact finding. But -- by internal
3 affairs. And in this particular case, based on
4 what I found, I recommended this actual charge
5 be sustained.
6   Q. Sergeant Constantino Weston (phonetic),
7 do you recall her testimony at all?
8   A. From five years ago, no, sir. I don't.
9   Q. Okay.
10   A. Sorry.
11   Q. Is Sergeant Weston someone that you would
12 say has credibility?
13   A. I wouldn't say anything different.
14   Q. So then it would be accurate to say that
15 she has credibility?
16   A. I haven't come across anything that I
17 wouldn't of find hers to be credible.
18   Q. What about Sergeant Willet Williams
19 (phonetic), does she have credibility?
20   A. Once again, I don't have any reason to
21 say yes or no.
22   Q. Are you aware that Sergeant Willet
23 Williams made a statement that an officer by the
24 name of Watson did not want to work with
25 Mr. Fulford, because he continuously asked her

Page 52

1 out?
2   A. Once again, I don't recall the events.
3   Q. In kind of going through the -- your
4 investigation of this matter there was -- would
5 you agree that there was statements made by
6 certain individuals that said Mr. Fulford said
7 certain things to them, but that those
8 individuals were not able to corroborate?
9   A. In any case you will find conflicting
10 information. And it's a matter of going through
11 everything and again finding the preponderance
12 of the evidence to which way it weighs more.
13   Q. Understood. In doing that, you have to
14 assess credibility towards different
15 individuals, correct?
16   A. Credibility, the actual details. If some
17 were able to provide -- and, also going through
18 the disposition panel and why they recommended
19 the allegations to be one way or the other.
20   Q. Sergeant Weston made a statement to
21 Ms. Boom, about Officers Watson Stanley
22 complaining, that Mr. Fulford asked them out or
23 to buy lunch.
24   Do you recall that?
25   A. I don't recall specifics to what was in



MARYDELL GUEVARA                                          August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                                       53–56

Page 53

1 the case. I would have reviewed it.
2    Q. So I'm showing you page 8, of -- I lost
3 pages. I'm showing page 8, of Exhibit 4, which
4 is the IA investigation. And it says -- I'll
5 ask you to read this paragraph.
6    A. Which paragraph, sir?
7    Q. It starts with Sergeant Weston said.
8    A. Sergeant Weston said two females
9 employees came to her about Sergeant Fulford
10 asking them for a date. The two officers were
11 Watson and Chantal Stanley.
12    Q. So if Officers Watson and Stanley both
13 denied making that statement, that would tend to
14 diminish Officer Weston's credibility, correct?
15    A. Not necessarily. They could have changed
16 their mind. They could have told her one thing
17 and then turned around and said something
18 different.
19    Q. Why wouldn't it be that Sergeant Weston
20 is the one that is, you know, not telling the
21 truth?
22    Why is it Officer Watson and Stanley that --
23    A. I wouldn't say it's either one. You
24 can't say it's either one automatically.
25    Q. So what do you do when you have a

Page 54

1 discrepancy like that?
2    A. You take everything into account.
3    Q. When you say you take everything into
4 account, how do you determine who to believe
5 when Officer -- or Sergeant Weston is saying one
6 thing and Officer Watson and Stanley are saying
7 another?
8    A. You -- again, it's the preponderance of
9 the evidence. And this surmises it. So I would
10 listen to the audiotapes. Maybe this was all
11 recorded. Maybe there's something more. How
12 they came across on tape -- what Watson and
13 Stanley's testimony was on tape. If there's
14 someone else saying something different. So
15 it's a variety of things when you look at
16 credibility. It's not just somebody said A
17 somebody said b, which one of them is lying.
18 They may not be lying. They may be going on
19 what they recall of the conversation. So it's
20 what they remember and not necessarily a flat
21 out lie.
22    Q. Understood. So let's continue going
23 through the allegations.
24    A. Sure.
25    Q. That Sergeant Fulford requested sexual

Page 55

1 favors from Officer Christian.
2    A. Yes.
3    Q. Can you tell me what did the disposition
4 panel say about that?
5    A. They recommended not sustained based on
6 the inability to validate and corroborate the
7 allegations. They felt that nobody else
8 witnessed or heard him make the sexual advances
9 towards the employee -- towards Officer
10 Christian.
11    Q. So you switched that allegation from not
12 sustained to sustained, correct?
13    A. I recommended sustained. Yes, sir.
14    Q. And I guess my question is, these are
15 some serious allegations?
16    A. Yes.
17    Q. How is it that the disposition panel
18 found not to sustain allegations of sexual
19 advances and requests for sexual favors, but in
20 the same evidence you found that there was
21 sufficient evidence?
22    A. Well, I could tell you a couple things.
23 I really dug into this when I looked at the
24 case.
25    Q. Any particular reason?

Page 56

1    A. Yeah. Because of the conflict that the
2 disposition panel had in their recommendations.
3 And I'll give you an example.
4    Allegation No. 3. Sergeant Fulford made
5 sexual comments about a female employee anatomy.
6 The disposition panel didn't sustain that. If
7 you go further on to Allegation 9. Sexual --
8 Sergeant Fulford sexually displayed sexually
9 suggestive photos. They sustained that.
10    He inappropriately used telecommunication
11 device to display sexually suggestive photos.
12 They sustained that. He utilized an officer's
13 account without her authorization to display
14 those photos. They sustained that. He made
15 sexual comments about females, they sustained
16 that. He made inappropriate sexual comments
17 that created sexually charged atmosphere in the
18 work place. They sustained that.
19    So they're sustaining all of these elements
20 of a sexual harassment. They actually
21 sustained --
22    Q. Well, let me ask you this question --
23    MS. MOSELY: She has not finished her
24 answer.
25    MR. STORCH: Sure. Finish.



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 15 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                       57—60

Page 57

1    A.  There was one.  That was Officer Fulford
2  -- Sergeant Fulford.  I'm sorry.  Retaliated
3  against Officer Christian.  They sustained that.
4  He obtained her personal cell phone for use
5  without her permission.  They sustained that.
6  So it's kind of -- to me -- and that's not the
7  only reason.  That was something I found that
8  was a conflict in how they were suggesting that.
9  Although that they felt that he retaliated
10  against her, that he had her phone number.  That
11  he was displaying sexually explicit photos, so
12  forth and so on.  Their reason for not
13  sustaining the sexual harassment is because they
14  didn't  feel that someone else came forward and
15  said yeah, I heard him sat this to her.  And
16  that in this particular case there was an
17  employee that stood by one of the times that he
18  spoke to her.  And although she did not hear
19  anything, she fully describes Officer Christian
20  grimacing and backing away from the Sergeant.
21  So to me there was significant preponderance of
22  the evidence to say was this more so sustainable
23  or not.  And in my opinion I recommended it be
24  sustained.
25    Q.  Who -- I'm sorry.  For interrupting.

Page 58

1   A.  Sure.
2    Q.  Who was the officer that you were just
3  referring to that didn't hear anything, but
4  witnessed someone grimacing, you said?
5    A.  I would have to go through.  And again,
6  this has been quite a long time.  Let me look
7  through this and I'll tell you.
8    That is stating Officer Frasier.  Officer
9  Frasier witnessed the conversation.  This is
10  with the disposition panel.  It says Officer
11  Frasier did not hear.  So that  was their
12  reasoning -- she did not witness it.
13    Let me read this a little more.  Yes.
14  Although Officer Frasier testified she did not
15  hear what Segregant Fulford whispered.  She also
16  testified that Sergeant Fulford whispered into
17  Officer Christian's ear.  Officer Christian
18  displaying expression of surprise and disgust.
19  Officer Frasier also heard Officer Christian
20  state at least three to four times now, Sergeant
21  Fulford let's keep it professional.  After
22  Sergeant Fulford walked off, Officer Christian
23  stated something has to be done about this.
24  So -- again, we are not talking about a standard
25  of clearing.  We're saying a proof beyond a

Page 59

1  shadow of a doubt.  We're talking preponderance.
2  And I found in my opinion it was there to
3  sustain.
4    Q.  Understood.  So we spoke about a lot
5  there.
6    So let me try to take it piece by piece.
7    As far as making sexual advances to Officer
8  Christian or requesting sexual favors from
9  Ms. Christian, you referenced some of the other
10  allegations that play into that.  Where
11  Mr. Fulford allegedly got Ms. Christian's cell
12  phone number, and allegedly showed her some
13  quote "sexually suggestive photos."
14  Inappropriately used Miami-Dade County
15  Telecommunication device, by displaying sexually
16  suggestive photos.
17    Let me ask you this question; is showing a
18  sexually suggestive photo the same thing as
19  requesting a sexual favor or making a sexual
20  advance?
21    A.  No.  It is not the same thing.
22    Q.  Okay.  We also spoke about something -- I
23  guess, it was Ms. Frasier, who said something
24  about witnessing Sergeant Fulford whispering
25  something in Ms. Christian's ear, correct?

Page 60

1    A.  Yes.
2    Q.  And that she -- meaning, Officer Frasier
3  did not hear what Mr. Fulford said?
4    A.  That's correct.
5    Q.  But she saw some sort of look of anger on
6  Ms. Christian after Mr. Fulford whispered in her
7  ear?
8    A.  Yeah.  I believe she -- I have it in
9  quotes.  She stated: "With a look of surprise
10  and disgust."  You would have to look through
11  Frasier's testimony.
12    Q.  Certainly.  And my question to you is,
13  other than a sexual suggestive comment or sexual
14  advance, is it possible that Mr. Fulford could
15  have said any other statement that would have
16  made Ms. Christian walk away in disgust?
17    A.  Absolutely.  There's not one piece,
18  individually, or by itself, that my
19  recommendation was based on.  It was based on
20  collectively -- all these different testimonies
21  and facts that came out of the case.
22    Q.  Was there anyone's testimony that you
23  felt was more reputable, or that you held more
24  weight to than others?
25    A.  Once again, we are talking about 2009.



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 16 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                       61–64

Page 61

1  So I can't specifically tell you if there was
2  one person that stood out more than others.  I
3  know that again, just based on reviewing for my
4  memo, it was collectively -- many things that
5  again, lead me to recommend to sustain based on
6  the preponderance that I found in these.
7     Q.  And those many things -- is there
8  anything that you -- I know we previously spoke
9  about these other allegations of the computer
10 photos.
11    Anything that you haven't told me, that you
12 kind of took into account as you were going
13 through and making your decision?
14    A.  Not that I recall.  Again, it was the
15 combination of the various things I came across
16 when I reviewed the IA file.
17    Q.  So that would be -- and just because I
18 need the record clear.  I hate to belabor this
19 point.
20    It would be statements and audio tapes that
21 were received from witnesses, correct?
22    A.  Yes.  The IA file itself.
23    Q.  Got it.
24    A.  That contained it.
25    Q.  Are you aware that Ms. Christian did not

Page 62

1  go to IA to make any complaints about
2  Mr. Fulford?
3     A.  No, I'm not.
4     Q.  Were you aware that this investigation
5  was started by IA coming to Ms. Christian?
6     A.  No, I'm not.
7     Q.  The allegations of Mr. Fulford coming on
8  to Officer Christian an and making sexually
9  advances, that was not heard by anyone else,
10 correct?
11    A.  I'm sorry.  Not heard?
12    Q.  Yeah.  Not actually heard.  Nobody heard
13 or witnessed Mr. Fulford make sexual advances or
14 request sexual favors from Officer Christian?
15    A.  Not necessarily.  There was some hearsay
16 testimony, I believe.  And other individuals
17 that claim that he made advances towards them.
18 But -- specifically, Officer Christian --
19    Q.  But as it relates to Officer Christian,
20 because the issues here were as they related to
21 Officer Christian, and not any other females.
22 And I understand what the allegations are.
23    A.  Okay.  Yeah.  I would differ with that.
24 If you have someone that's asking other
25 individuals -- making sexual advances to other

Page 63

1  individuals -- to say that would not have any
2  merit in someone saying that same person made
3  sexual advances to them.
4     Q.  So if someone makes a sexual advance to
5  person A --
6     A.  Uh-huh.
7     Q.  -- and the investigation is about person
8  B --
9     A.  Uh-huh.
10    Q.  Is it assumed that sexual advances were
11 made to person B?
12    A.  No. but if you spoke to person A, as a
13 witness, and they said yeah, that person made
14 sexual advances to me too, it would add
15 credibility to person B.  Especially if there's
16 a person C and D saying the same thing.
17    Q.  What about the testimony from several
18 individuals who stated that they never heard or
19 witnessed Mr. Fulford engaging in any of that
20 activity?
21    A.  I would have to counter with the fact
22 that you don't usually make a sexual advance in
23 a group setting.  And so I could make it to you
24 in a private setting, and not make it to
25 somebody else.  Maybe I just thought you were

Page 64

1  more attractive to me.  I don't know.
2     Q.  So then by that account it would mean
3  people who deny ever hearing anything would not
4  factor into your equation.  Because you're
5  automatically assuming that makes sense.  That
6  they are not going to -- that the alleged
7  harasser is not going to make a comment in front
8  of others, correct?
9     A.  I didn't understand that question.
10    Q.  So if several individuals deny hearing,
11 or witnessing any allegations or the sexual
12 request for sexual favors, or sexual advances,
13 those people are kind of being pushed to the
14 side then, because you are saying that it makes
15 sense.  That someone who's going to sexually
16 harass someone is going to do it without other
17 people there?
18    A.  No.  They wouldn't be pushed to the side.
19 But maybe they weren't standing in the corner
20 when the car accident happened.  So if they're
21 not standing in the location when the accident
22 happened, then they could say they didn't see
23 the accident.  It doesn't mean the accident
24 didn't happen.  I wouldn't push that aside to
25 take into account.



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 17 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                       65–68

Page 65

1    Q.  How do you balance that out knowing that
2  sexual harassment often time happens in a
3  one-on-one situation, which is a classic he
4  said, she said, correct?
5    A.  Correct.
6    Q.  And then you have many people saying it
7  did not happen.  I never witnessed anything.
8    A.  It did not happen to them, and they
9  didn't witness anything.  That's true.  It did
10  not happen to them.
11    Q.  And they didn't witness anything as it
12  relates to Mr. Fulford and Officer Christian?
13    A.  Correct.  I don't find that to be a
14  conflict.
15    Q.  No.  I understand that's not a conflict.
16  My question is, it seems to me that people
17  who are saying they never witnessed anything --
18  let's forget about the -- Mr. Fulford never made
19  an advance against me.  Let's talk about I never
20  witnessed Mr. Fulford make any advance or
21  request for a sexual favor against
22  Ms. Christian.
23  The people that are saying that --
24    A.  Yes.
25    Q.  -- are people who you're saying may not

Page 66

1  have been present when it happened, correct?
2    A.  That's one theory.  Yes.
3    Q.  So then it would only come down to the he
4  said, she said between Officer Christian and
5  Sergeant Fulford, correct?
6    A.  Absent any other information present,
7  such as what I previously stated.  In this
8  particular case, it did not come down to just
9  the he say, she say.  There were other things
10  that built up to the preponderance of evidence
11  for me.
12    Q.  Like what?
13    A.  Once again, the retaliation, which was
14  not only an allegation, it was a sustained
15  allegation upheld by an arbitrator.  The phone,
16  the sexually explicit pictures.  All those
17  things in combination.  It wasn't just he say,
18  she say.  And again, the preponderance of the
19  evidence.  And I'm not talking about proof
20  beyond shadow of doubt.  I'm talking about a
21  preponderance of the evidence.
22    Q.  So in this case, we are saying -- or in
23  this case, you are saying 50.1 percent it
24  happened, as opposed to 49.9 percent?
25    A.  Yes, sir.

Page 67

1    Q.  What about the fact that there's never
2  been any complaints against Mr. Fulford
3  previously?
4  Does that get taken into account?
5    A.  Absolutely.
6    Q.  And what kind of weight is that given?
7  Because I would think that someone who has
8  been employed for a decent amount of time, and
9  that would have their track records -- so to
10  speak, it would have some sort of weight to it?
11    A.  Yes.
12    Q.  So what kind of weight is not having any
13  trouble?
14    A.  It was taken into consideration.  And in
15  the -- it's a mitigating circumstance for the
16  discipline being imposed.
17    Q.  The discipline, meaning, the 30-day
18  recommended suspension?
19    A.  Yes.
20    Q.  Okay.  The allegations as it relates to
21  displaying sexually suggestive photos
22  inappropriately -- inappropriately.  I cannot
23  say that word today.  Using a Miami-Dade
24  Telecommunication device, by displaying sexually
25  suggested photos, downloading personal data

Page 68

1  files to Miami-Dade County computer.  Those
2  allegations seem to kind of all be surrounding
3  the same thing; is that correct?
4    A.  Most likely.  Yes.
5    Q.  Any reason that they were not combined
6  into one allegation?
7    A.  I believe, specifically, because they are
8  different violations.  And using of the
9  telecommunication device, and not using -- using
10  someone's account without their permission is
11  not the same.
12    Q.  But what about displaying sexually
13  suggestive photos and inappropriately using a
14  Dade County Telecommunication device, by
15  displaying sexually suggestive photos.  Those
16  would be the same thing, correct?
17    A.  They can be.
18    Q.  Any reason those two were not merged into
19  one?
20    A.  No.  No specific reason.
21    Q.  So I'm looking at the Exhibit 5, which is
22  the disposition of allegations.
23  And it states in No. 5, which is sustained.
24  I'll have you look at this document.
25    A.  Okay.



Page 69

1   Q.  But it states that the series of -- this
2  statement -- or Allegation No. 5, is about the
3  telephone.
4      Yes.  Allegation No. 5, Ms. Fulford obtained
5  Officer Christian's cellular telephone for
6  personal use without her permission.
7      So it states that the series of phone calls
8  made to Officer Christian by Sergeant Fulford
9  occurred on the same day he was moved as a
10  result of result Officer Christian filing her
11  complaint relevant to this investigation.
12      Do you see where it states that?
13      A.  Yes.
14      Q.  I'm going to show you testimony of
15  Officer Christian.  This is Volume 4, of the
16  American Arbitration Association of Shervin
17  Fulford and Miami-Dade County.  I guess, it's
18  case number:  32390001--0011. I'm trying to keep
19  my page.
20        MS. MOSELY:  Okay.  Well, actually -- let
21  me see. Just a moment.
22  BY MR. STORCH:
23      Q.  So the question states, you did not go to
24  internal affairs to file a complaint, did you?
25      A.  Answer:  No, I did not.

Page 70

1   Q.  Is that correct?
2   A.  That's correct.
3   Q.  Internal affairs came to you having heard
4  that incident happened, right?
5      Answer:  That's correct.
6        MS. MOSELY:  Objection.  Improper
7  predicate.
8        MR. STORCH:  You can limit it to form.
9  You have to limit it to form a deposition.
10        MS. MOSELY:  I understand.
11        MR. STORCH:  So your objection will be
12  noted as to form.  Thank you.
13        MS. MOSELY:  Did you have that transcript
14  marked?
15        MR. STORCH:  No.
16  BY MR. STORCH:
17      Q.  So is it fair to say that there were
18  individuals who denied ever seeing or hearing
19  any requests for sexual favors or advances as
20  the allegations against Ms. Christian are
21  related?
22      A.  I don't specifically recall that.  I
23  would have to look through the whole case.
24      Q.  Okay.  So you reviewed all these
25  documents, and you put together your memorandum,

Page 71

1  Exhibit No. 2?
2   A.  Yes, sir.
3   Q.  And what day was that all delivered to
4  Director Ryan?
5   A.  I don't recall.  It would have been -- he
6  signed off on --
7   Q.  September 14th --
8   A.  So it would have been close to that day.
9   Q.  Do you know if Director Ryan listened to
10  all of the audio tapes?
11      A.  I cannot speak for him.  I don't know
12  what he may have listened to.
13      Q.  Did you have any conversations with him
14  about this case?
15      A.  Yes.  We discussed the case.
16      Q.  At what point did you have your first
17  discussion with Director Ryan?
18      A.  I believe one of the issues in this case
19  was Sergeant Fulford was on probation at the
20  time, and his probation was close to ending.  So
21  based on the findings of the disposition panel,
22  I believe Director Ryan, myself, the legal
23  advisor, and it may have been someone else
24  present from the chain.  Maybe the chief, if I
25  can recall.

Page 72

1   Q.  Would that be Bendros?
2   A.  Most likely it would have been Chief
3  Bendros.
4      To look at the findings that were recommended
5  or sustained by the disposition panel as they
6  were at that time, I did mention that I had some
7  concerns about some of the nonsustained.  That I
8  needed further review on those.  But there was
9  sufficient issue with those that had been
10  recommended and sustained by the disposition
11  panel.
12      Q.  So then -- let me ask you this question;
13  the timing of that meeting, when would that have
14  been held?
15      A.  I don't recall specifically.  But it was
16  the catalyst for recommending Sergeant Fulford's
17  probation.
18      Q.  So you testified that you had some
19  concerns about the sustained and nonsustains,
20  correct?
21      A.  Yes, sir.
22      Q.  So that meeting would've had to have been
23  at the very earliest, September 4th of 2009,
24  correct?
25      A.  Once again, I don't recall specifically.



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
73–76

Page 73

1   Q. So you received the -- amongst other
2 things, the IA case. And we already established
3 that your signature on the closure memorandum
4 was dated September 4th, 2009?
5   A. Yes.
6   Q. Although it probably wasn't September
7 4th, 2009 that you signed it. It was the date
8 that you began reviewing the documents?
9   A. Most likely. Yes.
10   Q. So the meeting that you had -- that you
11 are talking about with Director Ryan, that would
12 have not been able to occur before September
13 4th, 2009, if you said you had concerns about
14 the not sustains in the IA report, correct?
15   A. I don't know specifically when the
16 meeting would have occurred. Chief Bendros may
17 have prompted the meeting, as well. So if --
18 once labor management received the initial --
19 and I just go based on the process. Once labor
20 management would've received the disposition
21 panel  memorandum, from that point they -- like
22 I say, they initiate the charging documents
23 based on the disposition panel memorandum. So
24 they would have done history on Sergeant
25 Fulford. And if they knew he was on probation,

Page 74

1 that may have well prompted some conversation.
2   Q. Understood.
3   A. So I can't really give you a date.
4   Q. But my question would be, you testified
5 that you had concerns about some of the
6 allegations that had not been sustained?
7   A. Correct.
8   Q. So you wouldn't have seen any of these
9 documents before September 4th, 2009; correct?
10   A. Again, I don't recall specifically. I
11 would have gotten -- they could've brought the
12 file to me, not have given that. I would not
13 necessarily officially started an in depth
14 review. But my concern would've been triggered
15 right off the bat just looking at the
16 disposition panel findings -- looking at them
17 and sustaining certain charges, and not
18 sustaining others. I found conflict just in
19 that. So that's what prompted my review into
20 those charges.
21   Q. No. That I understand. But it's
22 important that I try to establish a timeline
23 here.
24   A. Okay.
25   Q. Because earlier you had testified that

Page 75

1 the first time that you had gotten these
2 documents and reviewed them was -- would've been
3 in the chain of command?
4   A. Yes.
5   Q. And I believe it was Chief Bendros signed
6 on September 4th, 2009?
7   A. Yes.
8   Q. So you would not have reviewed it or
9 reviewed these documents before that date;
10 correct?
11   A. And I can't specifically say that, you
12 know, to my best recollection. But that doesn't
13 mean that she didn't bring something over to our
14 side, and say, hey, I have a concern with this,
15 because this person is on probation.
16   Q. But she approved the findings, correct?
17   A. Yes. The disposition panel. Yes.
18   Q. Sergeant Fulford -- ultimately there's a
19 letter that's dated September 1st, 2009. That
20 is terminating his probationary status. It's
21 Defendant No. 134?
22   Yes?
23   A. Uh-huh.
24   Q. Is that correct?
25   A. Yes. I'm looking at that. Yes.

Page 76

1   Q. So I question my question is, Director
2 Ryan didn't receive and review the documents
3 until after this date.
4   How is he approving the termination of the
5 probation?
6   A. Because once again, the disposition
7 panel, closing memorandum is completed. It goes
8 to IA. There's  significant, sustained
9 findings. You have an employee who's on
10 probation. That pretty much triggers an alarm,
11 separate and apart from the IA case. So if you
12 have these sustained findings, and, you know,
13 you have a panel saying we are sustaining it,
14 then there must have been a discussion prior to
15 completing the entire case on the probationary.
16   Q. So let me ask you this question:
17   A. Uh-huh.
18   Q. The findings in the closure -- excuse me.
19 The findings in the -- of the disposition panel
20 --
21   A. Yes.
22   Q. That's not final though, correct?
23   A. It's not final until the director signs
24 off on it from a technical stand point. But if
25 he has his chain of command coming to him and



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 20 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                       77–80

Page 77

1 basically saying, you know, I don't know if he
2 had a conversation with them.  Who was the chair
3 captain -- to say this was what we found.  He
4 could very well have said, you know this
5 behavior for someone on probationary -- I can't
6 have it.
7    Q.  When you say he, you mean --
8    A.  The director.  The director is the only
9 one final who would've had that final decision.
10 So he would've made that decision.
11    Q.  That decision would have been without any
12 independent review; correct?
13    A.  He would have relied specifically on his
14 legal advisor, myself and the chain.
15    Q.  Why take action against an employee, if
16 an investigation has not even been completed?
17    A.  The investigation was complete.  What
18 was --
19    Q.  Let me ask you this --
20        MS. MOSELY:  No.  You have to let her
21 finish  answering the question.  You asked her a
22 question.
23 BY MR. STORCH:
24    Q.  So why take action against an employee
25 when the final decision, which has to be made by

Page 78

1 the director has not yet been made?
2    A.  Because there was sufficient evidence
3 that the behavior that was there was
4 inappropriate for someone who's on probation,
5 which is a separate track from disciplinary.
6    Q.  Understood.  But at the time of this
7 letter, you had not reviewed the documents;
8 correct?
9    A.  I had reviewed primarily the disposition
10 panel's findings.  Most likely.  That I recall.
11    Q.  So you did receive documents before Chief
12 Bendros, because she didn't sign until September
13 4th?
14    A.  That doesn't mean she didn't receive it.
15 Her signature may very well be her closing it
16 out.  Everybody does it different.  She would've
17 raised a concern -- actually it would've been
18 labor management raising as concern and saying
19 we have an employee on probation.  So  from that
20 point, if you have an employee on probation, you
21 have a certain behavior -- at least you have a
22 panel saying, look, we found this behavior.  And
23 anyone along the chain can kind of take a look
24 at it and say, yeah, we think there's enough
25 merit here.  That suggestion and recommendation

Page 79

1 goes to the director.  The director makes a
2 decision whether to say I hear what you're
3 saying.  Let's move forward this way.  Let's
4 move forward that way.  Let's do a dual track.
5 In this case there was a dual track
6    Q.  So Mr. Fulford's probation was
7 terminated, because he was coming up for making
8 that one year.  So you had to act quickly; is
9 that correct?
10    A.  A decision had to be made timely.  Yes.
11    Q.  Why -- what happened to innocent until
12 proven guilty?
13    A.  Once again, the disposition panel found
14 and sustained the findings.  So it was just --
15 there was no turning back on that.  Unless there
16 was something else.  There was a smoking gun in
17 the sustained findings.  Each individual that
18 reviewed it -- for example, the chief, myself --
19 did a quick review to say yes.  What the
20 disposition panel was claiming, is there -- this
21 is what we have.  The final decision is up to
22 the director.
23    Q.  And you had input into the director's
24 decision?
25    A.  We all had input.  Yes.

Page 80

1    Q.  And when you say we all, who's that?
2    A.  Senior advisor, it would've been the
3 chief.  And the disposition findings.  And the
4 chain that agreed with it all the way up until
5 there.
6    Q.  But that didn't happen until after
7 Mr. Fulford was terminated on the probation?
8    A.  No.  The chain of command would've
9 reviewed it to a certain point.
10    Q.  Now, I'm totally confused.  I'm sorry.
11    A.  So you have the disposition panel.  So
12 Chief Bendros signs off on it, 094.  Closing her
13 review out.  That does not mean she did not
14 receive it prior to then.  So again, labor
15 management would've said we have an issue.  This
16 person's probation is.  Getting near to the end.
17 There's a huddle.  The information is presented
18 to the director and he makes his decision.  He
19 would have relied on and put from the senior
20 advisor, and from Chief Bendros and from myself.
21    Q.  Have there ever been instances where
22 someone's probation was -- strike that.
23    Has there ever been instances where
24 allegation were made against someone that were
25 sustained, that ultimately ended up being



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 21 of 41

MARYDELL GUEVARA                                         August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                            81–84

Page 81

1 reversed and not sustained as those allegations,
2 and therefore no action should have been taken?
3    A. There have been some cases.
4    Q. So knowing that, why terminate
5 Mr. Fulford's probation before you or the chain
6 of command had an opportunity to conduct a full
7 review and listen to all of the tapes in all of
8 the documents and review all of the documents
9 independently through the chain of command?
10    A. Because once again, based on my
11 recollection, looking at what the disposition
12 panel had put together, and the evidence that
13 they stated that they relied on to sustain that
14 it was sufficient for us to have a concern. And
15 based on the timeliness of the probation, the
16 recommendation was made, and the director
17 decided to -- failure of probation.
18    Q. And the failure of probation arises out
19 of these allegations of sexual harassment that
20 were made against Mr. Fulford?
21    A. No. Not the sexual harassment. Those
22 were afterwards.
23    Q. The termination of probation arises out
24 of what conduct?
25    A. The behavior that was noted in the

Page 82

1 sustained allegations. The allegations that
2 were sustained prior to my memorandum.
3    Q. Has there ever been an instance -- let me
4 ask you this: And everyone had to act quickly,
5 is my understanding then, because Mr. Fulford
6 was coming up on making probation, correct?
7    A. Correct.
8    Q. And had he made probation, he would've
9 had a right to appeal, correct?
10    A. You have a right to appeal. That's
11 correct.
12    Q. So everyone had to move fast to terminate
13 his probation prior to him having the right to
14 appeal; correct?
15    A. That was based on the timeliness. Yes.
16    Q. Understood. I'm going to take a restroom
17 break.
18       (OFF THE RECORD AT 3:17 P.M.)
19       (BACK ON THE RECORD AT 3:26 P.M.)
20 BY MR. STORCH:
21    Q. Also, on September 1st, 2009 there's a
22 memorandum from Director Tim Ryan, regarding
23 Mr. Fulford. I'll ask you to take a look at
24 this, please, Ms. Guevara.
25    A. Okay.

Page 83

1    Q. Is this your signature on this document?
2    A. Yes, it is. I signed for it.
3    Q. When you sign for Director Ryan, do you
4 let him know that you are signing, or do you
5 have the authority to sign in his absence?
6    A. No. I sign in his absence. And
7 specifically something like this would be
8 just -- he was out, so I signed for it. It had
9 to get put out.
10    Q. Understood. My -- but just so I
11 understand. You have the authority to sign for
12 him in his absence?
13    A. Yes. He would've --
14    Q. Understood.
15       It says that's effective: 12:01 a.m.,
16 Monday, September 7th, 2009. The following
17 assignment will take place. And it talks about
18 an assignment from -- the demotion from
19 correctional sergeant to correctional corporal,
20 correct?
21    A. Yes.
22    Q. This document, it seems to be given one
23 week before it becomes effective, correct?
24    A. Yes.
25    Q. What is this two week notification period

Page 84

1 that states it's been administratively --
2    A. The Collective Bargaining Association
3 requires two week notification of transfers.
4 And so that's pretty much there to say it's more
5 of a way for personnel to calculate pay periods
6 and moving.
7    Q. Understood. So that I understand -- just
8 because I was a little confused by the one week
9 and the two week.
10    A. Two week --
11    Q. I was reading it. And I saying, okay. I
12 understand one week in between effectiveness.
13 But then we're talking about two weeks. And I
14 was getting confused.
15       Is the -- this two week period that's being
16 waived, that's something different than the one
17 week period?
18    A. It's -- it's not. I don't know how to
19 explain it. It's more of a personnel -- for
20 personnel action. Usually you give someone two
21 weeks notice before you move -- you transfer
22 them. In this particular case it's not being
23 transferred. It's a demotion, because he
24 remains in the same location and time frame,
25 minus 30 minutes. But it's more of a personnel



Case 1:15-cv-23061-KMM  Document 51-4  Entered on FLSD Docket 09/12/2016  Page 22 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                              85—88

Page 85

1 action. So they know the two weeks was
2 administratively waived. So you're required to
3 give somebody two weeks notice in the change of
4 assignment.
5    Q. If the two week period was being waived,
6 why give a week then?
7    I'm trying to understand.
8    A. Yes. Just because the memo may have been
9 dated September 1st, and the date was the 7th.
10   Q. Is there any requirement that one week be
11 given for a transfer?
12   A. No.
13   Q. What about this two week, is there any
14 requirement to give two weeks?
15   A. There's a two week notice that you give
16 an employee, unless there's administrative
17 action that waives it.
18   Q. Is there any requirement for a waiver?
19   I assume that this sentence: The employee
20 two week notification period is being
21 administratively waived is in there for a
22 reason?
23   A. Yes. You always want to give an employee
24 two week notice before you transfer assignment.
25 This is again more of a personnel action to do

Page 86

1 for the pay code -- the par -- the personnel and
2 attendance record, so that they know effective
3 the 7th when he goes to become a corporal.
4 And this is just basically saying, you know,
5 two weeks that we usually give folks is waived.
6    Q. When you say that we usually give -- is
7 there a requirement --
8    A. Yes.
9    Q. Is there a requirement?
10   A. The PBA, the Collective Bargaining
11 Association requires the two week notice for a
12 change in assignment -- a transfer from one
13 location to another location.
14   Q. So is it -- transfer, meaning that two
15 week period is only given when you are moved
16 from one location to another?
17   A. That's correct.
18   Q. It has nothing to do with any time given
19 for a demotion?
20   A. No. It's specifically --
21   Q. Okay.
22   A. And it was there just because that's the
23 way the do transfer assignments. And this is
24 basically -- more of a demotion memo. But it
25 was typed up in a transfer, type format.

Page 87

1    Q. To administratively waive this period,
2 are there any?
3    A. Transfer period.
4    Q. Are there any requirements?
5    Meaning, does the employee have to consent to
6 that waiver?
7    A. For an administrative waive, no. There
8 has to be merit behind it. Obviously, the
9 police benevolent association would not allow us
10 to move someone from one point to another
11 without some reason.
12   Q. The police benevolent association, that's
13 the PBA, the Union, correct?
14   A. Yes.
15   Q. Okay. And according to the -- to that
16 memo --
17   A. Uh-huh.
18   Q. You said that his shift was being changed
19 by 30 minutes, correct?
20   A. Yes. And then it's based on the actual
21 classification. The sergeant start on the hour,
22 and corporals and officers start on the half
23 hour.
24   Q. Understood. Very communicated operation.
25   I'm going to show you Article 39, Transfer,

Page 88

1 Schedules and Shift Rotations.
2    We can put a mark over this exhibit sticker.
3 It's from the prior deposition. Okay.
4    So according to Article 39, Transfer,
5 Schedules and Shift Rotations, it's the right of
6 the department director to transfer employees
7 between units within their department for
8 reasons that improve the effectiveness, or
9 efficiency of the department, correct?
10   A. Yes.
11   Q. However, when a transfer means a change
12 in work, hours or days off, the employee shall
13 be notified in writing no less than fourteen
14 calendar days prior to a transfer to another
15 district or a bureau, in order to enable an
16 employee to arrange for an orderly change,
17 correct?
18   A. Yes.
19   Q. According to this memo, Mr. Fulford had a
20 change in work hours, correct?
21   A. Yes, by 30 minutes.
22   Q. Okay. The notice may be waived upon
23 consent of the employee, or if the transfer is
24 declared an emergency by the department director
25 or division chief, correct?



MARYDELL GUEVARA                                August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                   89—92

Page 89

1   A.  Yes.
2   Q.  Did Mr. Fulford consent to the transfer?
3   A.  Not that I'm aware of.  He may have.
4   Q.  I asked a horrible question.
5   A.  Okay.
6   Q.  Did Mr. Fulford agree to the waiver of
7  the two week notification period?
8   A.  Not that I'm aware of.
9   Q.  Was the transfer declared an emergency by
10  the department director or division chief?
11   A.  Not that I'm aware of.
12   Q.  So why was the two week notification
13  waived?
14   A.  Again, administratively, the department
15  has the right to do that in these kind of cases.
16   Q.  When you say these kind of cases, what do
17  you mean?
18   A.  Prior to this he was a sergeant.  Upon
19  being demoted, he was a corporal.  So there's a
20  different assignment.
21   Q.  Understood.  But according to Article
22  39 --
23   A.  Uh-huh.
24   Q.  Notice can be waived only upon consent of
25  an employee, or if the transfer is declared an

Page 90

1  emergency by the department director or the
2  division chief, correct?
3   A.  It also says in this particular case --
4  we have administratively waive it.  And I don't
5  know where to direct you to find that.  But I
6  can say in this case its says:
7   Transfers within the same district or bureau,
8  which is this one.  Requires 7 days notice prior
9  to transfer, which he had.
10   Q.  Understood.  I'm talking only about the
11  two-week.  I'm not talking about the one-week.
12   A.  Yeah.  But the one week is in compliance
13  with the PBA, if that's where you're going.  But
14  administratively -- I'll give you an example.
15   If someone is under investigation, and you
16  need to move them from a facility to another
17  facility, that is a transfer.  The transfer is
18  not going to take two weeks.  We do it
19  immediately the next work day.  And say
20  administratively waive in two-week.  The PBA is
21  aware they will says is there an investigation
22  going on?  And we'll say yes.  And they back
23  off because of extenuating circumstances.
24   Q.  I understand that.  But we already
25  established that there was no emergency,

Page 91

1  correct?
2   A.  That's correct.
3   Q.  Okay.  And we already established that
4  Mr. Fulford didn't consent to the waiver?
5   A.  Correct.  And we established that it
6  meets the PBA by the one week.
7   Q.  Well, we've established that the
8  effectiveness was September 7th, and the date of
9  this letter is September 1st?
10   A.  Which is one week.
11   Q.  One week.  But I'm talking about the
12  two-week period.
13   A.  Right.  But this doesn't require a
14  two-week period if he's within the same bureau.
15   Q.  This space -- when a transfer means a
16  change in work, hours or days off, the employee
17  shall be notified in writing no less than 14
18  calendar days prior to a transfer to another
19  district or bureau in order to enable the
20  employee to arrange for an orderly change.
21   A.  Right.  keep going.
22   Q.  Such -- you can read.
23   A.  Such notice and the location of the new
24  assignment and the reason for transfer.
25  Transfers within the same division or bureau

Page 92

1  shall require.  Seven calendar days prior to the
2  transfer.  Which this meets.
3   Q.  But we're talking about the notice.
4   A.  Right.  Seven days.
5   Q.  The waiver.
6   A.  Right.  No.  But this transfer happened
7  within seven days.
8   Q.  Then why even make a comment about --
9   A.  Again, because -- again, it's standard on
10  every transfer.  But within the bureau, the
11  Collective Bargaining Agreement allows the
12  transfer to take place within one week, if it's
13  the same bureau.
14   Q.  But we have established that hours were
15  changed, correct?
16   A.  Right.  And even with the change, as long
17  as it's within the same bureau, you don't need a
18  two-week.  You can do it within a one-week.
19   Q.  And we understood that the September 1st
20  date was -- action had to be taken so that
21  Mr. Fulford could not make probation?
22   A.  No.  This is actually -- he's already
23  going to -- from a sergeant to a corporal.  And
24  actually I think he was already at that time.
25   Q.  Same date?  September 1st, 2009?



MARYDELL GUEVARA                                           August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                                      93–96

Page 93

1   A.  Right.
2   Q.  So the action --
3   A.  This is a demotion, and this is the
4  transfer reflecting the demotion from sergeant
5  to corporal.
6   Q.  And the action needed to be taken
7  quickly, because --
8   A.  Timely.
9   Q.  -- Because he was going to be --
10   A.  Yes.  And I don't know exactly when he
11  would've made his probation.
12   Q.  September 22nd.
13   A.  Okay.
14   Q.  So --
15   A.  The action had to be timely.  Yes.  And
16  he's actually out during that time.
17   Q.  Understood.
18   A.  Okay.
19   Q.  Do you know if efforts were made to give
20  Mr. Fulford this demotion memorandum on
21  September 1st?
22   A.  Yes.  I remember -- I recall trying to
23  reach Sergeant Fulford.  But he was out on
24  leave, or couldn't be found.
25   Q.  Mr. Fulford didn't go out on leave until

Page 94

1  September 3rd.  He -- well, he left early on
2  September 3rd.  So there was at least two and
3  a half days in between that time period.
4    Do you know if any efforts were made to give
5  him that document indicating his demotion
6  between those --
7   A.  From what I recall, yes.  And he was not
8  -- they could not locate him for the signature.
9  So I know went to the facility.  The captain was
10  supposed to serve it.  The captain couldn't.  He
11  was unable to serve it.  It came back to
12  headquarters, and we couldn't reach Mr. Fulford.
13  I'm just going based on recollection.
14   Q.  Certainly.  So Ms. Bendros testified in
15  the arbitration that the September 1st, 2009
16  letter terminating Mr. Fulford's probationary
17  status as a sergeant, that she was given the
18  letter to present the captain of TGK, who
19  reported directly to Ms. Bendros, with the
20  direction that she was going to serve
21  Mr. Fulford on September 3rd.
22   A.  Okay.
23   MS. MOSELY:  Objection.  Form.
24  BY MR. STORCH:
25   Q.  I didn't ask the question.

Page 95

1   MS. MOSELY:  Okay.
2  BY MR. STORCH:
3   Q.  So my question is, why would a letter be
4  dated September 1st, but then instruction given
5  not to deliver the letter until two days later?
6   A.  It may have been his two days off.  I
7  don't know.  But I have to go back and look at
8  dates.  It may have been his two days off.
9   Q.  If Mr. Fulford was at work on September
10  1st, September 2nd and September 3rd, would
11  there be any reason to delay giving him the
12  demotion letter?
13   A.  I would not know of any reason.
14   Q.  As far as evaluations while you're on
15  probation, can you tell me how that works?
16   A.  Specially?
17   Q.  How often?  Is it a six month evaluation?
18  And then another six months would make it -- so
19  basically, sis it a mid-year and an annual?  Or
20  is it informal?
21   How does that work?
22   A.  There were monthly evaluations.  And
23  again, based on my recollection, there were
24  monthly evaluations at some point that were
25  started.  And then there was a year.  And there

Page 96

1  should always be communications between the
2  supervisor and employee.
3   Q.  Understood.
4   Are you aware that during his time as a
5  probationary sergeant, Mr. Fulford received
6  above satisfactory outstanding monthly
7  evaluations?
8   A.  I can't say I recall right now.  But if
9  it was in the IA case, it would have been looked
10  at, and his personnel file would've been looked
11  at.
12   Q.  Certainly.  And that would have, or
13  should have had some sort of weight to it?
14   A.  Sure.
15   Q.  So if it's monthly evaluation, and all of
16  these allegations, I guess, are -- I'll say
17  coming to a closure in some time in September of
18  2009, he would've -- Mr. Fulford would have
19  received a poor evaluation, as a result of this,
20  correct?
21   A.  No.  Not necessarily.  Because, again,
22  this is part of an IA case that may not have
23  been known to the supervisor.  So the findings
24  would not have been known to the line for
25  supervisor.



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 25 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                              97–100

Page 97

1    Q.  The line for supervisor and the chain of
2  command, is that different?
3    A.  Yes.
4    Q.  But his supervisors would've known that
5  something was going on, because like you
6  testified earlier, he was transferred somewhere?
7    A.  Not necessarily the specifics of it.  You
8  have a lieutenant and a sergeant who was being
9  directly supervised by a shift lieutenant.  And
10  you have an administrative lieutenant and you
11  have a captain.  A shift lieutenant would've not
12  have known the reason for his transfer.
13    Q.  The captain?
14    A.  The captain would've been.
15    Q.  And is the captain required to sign
16  monthly evaluations?
17    A.  I don't know if they are required to sign
18  monthly or not.  I can't recall that.
19    Q.  Did you ever have any discussion with
20  Captain Fuller about any monthly evaluations of
21  Mr. Fulford?
22    A.  No.
23    Q.  So if someone was to testify that you
24  told them not to give a good evaluation, or an
25  evaluation at all to Mr. Fulford, for September

Page 98

1  of 2009, that would be false; correct?
2    A.  That's correct.
3    Q.  Okay.  So we talked a little about the --
4  a little bit more than just a little about the
5  demotion.
6    A.  Yes.
7    Q.  But there's another aspect to it,
8  correct?  Discipline?
9    A.  Yes.
10    Q.  Okay.  Tell me about the discipline part
11  of this.
12    A.  Specifically?
13    Q.  At what point is discipline discussed?
14    A.  Discipline would be discussed after the
15  director has finalized his findings.  His
16  findings of -- you know, what he wants to
17  uphold.  And then it goes back to upper
18  management to put the charging document
19  together.  And then it goes to give a
20  recommended level of discipline.  And then it
21  goes back through the chain of command.
22    Q.  Had Mr. Fulford not been coming up on the
23  end of his probation, there would've been no
24  need to issue any type of early termination of
25  his probation, correct?

Page 99

1    A.  If he wasn't coming up for probation,
2  there would be no action.
3    Q.  I'm -- just so I understand --
4    A.  Uh-huh.
5    Q.  If Mr. Fulford had been in his second
6  month of being a sergeant --
7    A.  Yes, sir.
8    Q.  There would have been no need to send a
9  letter of -- terminating his probation, because
10  the entire investigation would have been closed
11  by the time he would -- his -- he would've made
12  probation.  I think that's the term.
13    A.  So let me review it to make sure I'm
14  understanding your question.
15    If he -- are you saying that if he only had
16  two months of probation, he would've had to
17  worry about failing his probation?
18    Q.  No.  I'm sorry.
19    A.  Okay.
20    Q.  Thank you for telling me you did not
21  understand.
22    If Mr. Fulford had been promoted in January
23  of 2016 -- January 1st, 2016, Mr. Fulford had
24  been promoted, and he was a probationary
25  sergeant at that point, correct?

Page 100

1    A.  At this time he was a probationary
2  sergeant.  Yes.
3    Q.  If Mr. Fulford, on December 31st, 2015
4  was a corporal, and on January 1st, 2016, he was
5  promoted to sergeant starting January 1st 2016,
6  he would have been a probationary sergeant,
7  correct?
8    A.  Okay.
9    Q.  Is that correct?
10    A.  I'm not following you.  But --
11    Q.  What I'm trying to establish is, that you
12  have one year of --
13    A.  There's a year.  Yes.  You are on
14  probation for a year.
15    Q.  So if he was promoted January 1st, of
16  2016, he would be a probationary sergeant until
17  December 31st,  2016?  The entire year?
18    A.  Yeah.  Actually, the January -- however
19  they do it.  So it would be January 1st.
20    Q.  Got it.  So if these allegations were
21  made February 1st, 2016 -- so one month into his
22  probationary status.
23    A.  Yes.
24    Q.  There would've been no need to terminate
25  his probation quickly.  Meaning, there would



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 26 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                              101–104

Page 101

1 have been no need to act quickly, because there
2 was still basically almost a full year for the
3 investigation to go on; is that correct?
4    A.  No.  Not necessarily.  I believe based on
5 the discussions that we had had and the findings
6 that the disposition came back with, even if all
7 he was on probation for a month, we would've
8 failed his probation.
9    Q.  But I thought that the labor management,
10 or chain of command recognized that his
11 probation was coming up, so you had to act
12 quickly?
13    A.  We didn't have to act quickly.
14    Q.  So you wouldn't have had to act quickly
15 if his probation was not coming up?
16    A.  We wouldn't had to act as quickly.  But
17 we would not have waited the entire way.  In
18 other words, we would have moved forward to
19 terminate the probation even before the whole
20 file was completed.  We would've taken the same
21 action.  There would not have been as much
22 pressure to make sure.  But the probationary
23 would've failed.  Even if he was under a one
24 month of probation it may have been even
25 quicker, because if you have a person -- a

Page 102

1 person that's on their best behavior, if you're
2 on probation one month, and this is the behavior
3 that's coming out, it's pretty concerning.  And
4 so the probation would've probably failed.  It
5 might have failed quicker.
6    Q.  When you say you're on your best behavior
7 -- when the individual is only on probation,
8 because you recognized excellence in them and
9 promoted them?
10    A.  Correct.
11    Q.  So I guess I'm confused why would you be
12 on your best behavior during probation if you've
13 been displaying the behavior needed to be
14 promoted?
15    A.  Let's say you just get promoted -- you've
16 gotten promoted, and you're doing great.  You
17 tested well.  Your profile looks good.  You get
18 promoted, and all of a sudden you decided that
19 you're going to take off every Friday.  You
20 become an attendance issue.  That becomes a
21 concern.  You fail your probation.
22    Q.  Got it.  How often is an investigation
23 finished -- let me ask you this question:
24    Why not wait until the end of the
25 investigation to hand out discipline and any

Page 103

1 other types of administrative punishment,
2 because it would make sense to me that at the
3 end, you have all of the facts.  So why not
4 wait?
5    A.  Well, once again, the facts were all
6 present.  Whether we agreed on all of the facts
7 or not, the director once presented with the
8 facts was the one that made the decision to move
9 forward.  So --
10    Q.  Without any independent review then?
11    A.  He -- I believe he had enough trust and
12 faith in his senior legal advisor and his chain.
13    Q.  So this 30 day disciplinary issue, was
14 that handed down immediately?
15    A.  No.  It was not.
16    Q.  Do you know -- do you recall when it was
17 handed down?
18    A.  I don't recall.  I don't know that it
19 took too long.
20    Q.  Why?
21    A.  I cannot explain why.
22    Q.  If everything was rushed to get his
23 probation terminated, because he was coming up
24 on making probation, why couldn't the department
25 act with the same quickness to give him his

Page 104

1 discipline?
2    A.  I cannot speak to what may have caused
3 the, length in finalizing the discipline.
4 Sometimes it's a matter of getting all the
5 people together.  Sometimes it's a matter of
6 getting together with the attorney, and the
7 arbitrator, and scheduling with the other side.
8 Sometimes it's the defendant's attorney that
9 can't meet certain dates.  So I can't speak to
10 what occurred.
11    Q.  But it was no problem getting everyone
12 together quickly for the termination of his
13 probation, correct?
14    A.  Well, I would say that's a sole
15 department function.  So we can move a lot
16 quicker than having to rely on three and four
17 other parties.
18    Q.  Ultimately, the 30-day suspension was
19 served, correct?
20    A.  That's correct.
21    Q.  And ultimately an arbitrator found that
22 shouldn't have been the case; is that correct?
23    A.  I believe there was a due process
24 concern.
25    Q.  And as a result, Mr. Fulford -- it was



MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                       105–108

Page 105

1 determined should not have been suspended for 30
2 days, correct?
3    A.  Yes.  Based on that due process.
4    Q.  And as a result, Mr. Fulford was --
5 excuse me.
6    As a result, the department was required to
7 pay Mr. Fulford for those 30 days that he
8 missed?
9    A.  That's correct.
10   Q.  Or 30 days that he was suspended for?
11   A.  That's correct.
12   Q.  On the bottom of the DAR there is some
13 writing.
14   Could you tell me what it stands for?
15   A.  Where it says demotion reduced to 30-days
16 suspension?
17   Q.  Yes.
18   A.  Yes.  Demotion reduced to 30-days
19 suspension.
20   Q.  Is that accurate?
21   A.  Yes.
22   Q.  I thought that Mr. Fulford was demoted
23 and received the 30 days suspension?
24   A.  The demotion to 30-days suspension there
25 is specifically related to the disciplinary

Page 106

1 action.  So the disciplinary action -- actually,
2 there was a recommendation for demotion.  It
3 would've been a double demotion.
4    Q.  I'm now totally confused.
5    A.  Okay.  So --
6    Q.  I --
7    A.  This is disciplinary only.  This is
8 nothing to do with probation.
9    Q.  Question --
10   A.  Okay.
11   Q.  Can you be -- can an employee be demoted
12 in the disciplinary process?
13   A.  Yes.
14   Q.  And an employee can be demoted in the
15 administrative process?
16   A.  An employee's probation could be failed
17 in the administrative process.
18   Q.  Got it.  So as far as these allegations
19 are concerned, the demotion to a 30-day
20 suspension -- who recommended demotion?
21   A.  I would have to see if it was the labor
22 management -- the actual base recommendation.
23   Q.  Is labor management responsible for
24 making recommendations regarding disciplinary?
25   A.  Yes.  They will identify the base for

Page 107

1 consistency.
2    Q.  So in this case, it would seem that the
3 initial reaction or recommendation was demotion,
4 correct?
5    A.  Correct.
6    Q.  And then, ultimately it seems that that
7 demotion was reduced to a 30-day suspension?
8    A.  That's correct.
9    Q.  Who would reduce the recommendation of
10 demotion to a 30-day suspension?
11   A.  Ultimately it's the director's decision.
12 However, there's a chain of command memo with
13 that discipline being recommended that would go
14 all the way up to him.  He would make the final
15 decision.
16   Q.  Are you involved in --
17   A.  I would have been.  Yes.
18   Q.  Okay.  And your recommendation though --
19 strike that.
20   The -- do you recall when the recommendation
21 was made from demotion to 30-day suspension?
22   A.  I would have to look at the actual
23 tracking of the discipline.
24   Q.  Okay.  Someone who had allegations
25 similar to Mr. Fulford's -- meaning, allegations

Page 108

1 against him --
2    A.  Yes.
3    Q.  -- would have received the exact same
4 recommendations, correct?
5    A.  From labor management?
6    Q.  Overall the recommendations as to any
7 administrative issues or discipline would be the
8 same for someone who had allegations levied
9 against them similar to the ones against
10 Mr. Fulford, correct?
11   A.  Not a yes or no.  The reason I'm asking
12 labor management is, because labor management is
13 specifically the violations.  They don't take
14 the person's profile into account.  As it goes
15 up the chain of command, each of those
16 individual supervisors we're required to take
17 the person's professional profile into account.
18 So that you can have two similar charges, and
19 there could be mitigating or aggravating factors
20 that you have to weigh into the final
21 recommendation for the discipline.  And then the
22 director looks at all of those things and makes
23 the final decision.
24   Q.  And the final decision of the director
25 is?



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
109–112

Page 109

1    A.  In this case --
2    Q.  -- with input from you, as part -- as the
3  deputy director at the time?
4    A.  Yes.
5    Q.  Are you familiar with a lieutenant
6  Mariette Dominguez?
7    A.  Yes, I am.
8    Q.  Can you tell me how, or how you're
9  familiar with her?
10    A.  Because you mentioned her previously in
11  the beginning of the deposition.
12    Q.  Were you not familiar with her before I
13  mentioned her name?
14    A.  Of course.  She was a lieutenant in the
15  department.
16    Q.  So you had some interactions with her?
17    A.  Yes.
18    Q.  How often would you say you had
19  interactions?
20    A.  I couldn't say.  Every once and a while.
21    Q.  Once a month?  Once a week?
22    A.  Maybe once a month during command staff
23  meetings.
24    Q.  Did anyone ever complain about
25  Ms. Dominguez?

Page 110

1    A.  Yes.
2    Q.  On more than one occasion?
3    A.  I believe at lease on two occasions.
4    Q.  And were both of those complaints sexual
5  harassment?
6    A.  No.
7    Q.  Can you tell me what those were about?
8    A.  If I remember -- I recall -- it was more
9  of her style of management.  She was rude.  She
10  could be bolder.  So she created a hostile
11  environment.  Not sexual harassment, but
12  hostile.
13    Q.  Do you recall if there was ever any
14  sexual harassment that were made?
15    A.  I think the last case may have included
16  something.  I would have to look at it
17  specifically.  I don't recall.
18    MS. MOSELY:  Is it your intention to show
19  documents that involve notes with underlines on
20  it?
21    MR. STORCH:  Yes.  It's not a problem.
22  BY MR. STORCH:
23    Q.  Okay.  So here is a document.  It's dated
24  May 19th, 2011.  It's a -- from Jacqueline
25  Howard, from the IA unit.  And it's an

Page 111

1  investigation into allegations against
2  Lieutenant Mariette Dominguez.
3    Have you ever seen that document?
4    A.  I would have seen it.  Yes.
5    Q.  So let's go through a couple of things.
6    So some of the allegations are:
7    Lieutenant Dominguez harassed her staff by
8  threatening and intimidating them.
9    Do you see that?
10    A.  Uh-huh.  Yes.
11    Q.  And number four, Lieutenant Dominguez
12  created a hostile work environment?
13    A.  Yes.
14    Q.  Number five, on various occasions in an
15  open environment Lieutenant Dominguez made
16  unwelcoming sexual gestures, towards staff by
17  grabbing her breast and her crouch area in a
18  derogatory manner.  Do you see that?
19    A.  Yes.
20    Q.  On various occasion Lieutenant Dominguez
21  made unprofessional gender based comments to
22  staff, by telling the male employees that she
23  had "bigger balls, and her balls were bigger
24  than there's."
25    A.  Yes.

Page 112

1    Q.  On various occasions Lieutenant Dominguez
2  engaged in unprofessional conduct by openly
3  kissing, hugging, pinching and squeezing Officer
4  Hernandez and made it an uncomfortable working
5  environment for other staff?
6    A.  Yes.
7    Q.  Lieutenant Dominguez engaged in
8  unprofessional conduct by referring to her
9  breast as sagging, hanging and stating "The
10  headlights are on."?
11    A.  Yes.
12    Q.  Lieutenant Dominguez made negative and
13  unprofessional gender based comments.  "Men not
14  doing anything right.  They are only good for
15  one thing.  You are just a man." -- to male
16  staff in the presence of others?
17    A.  Yes.
18    Q.  And that's a sexual harassment
19  allegation, correct?
20    A.  They classified that as misconduct and
21  not sexual harassment.
22    Q.  So this next comment -- that Lieutenant
23  Dominguez made inappropriate and explicit sexual
24  comment regarding a calendar of men that was
25  hanging in her office by stating -- "I would



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
113—116

Page 113

1 fuck anyone of these guys on this board without
2 hesitation. And no it's not cheating because
3 I've already told my husband the same think.
4 I'll do it in front of him."?
5    A. Yes.
6    Q. Lieutenant Dominguez made an
7 unprofessional, inappropriate and explicit
8 comment by stating:
9    "Well, if they rape me, they better fuck me
10 good. I'm not worried about the money. They
11 can have the money. As long as they rape me,
12 they better fuck me good."
13    A. Yes.
14    Q. Do you see Lieutenant Dominguez made
15 unprofessional and unwelcoming sexual comments
16 towards staff. Such as: "They ripped me a new
17 asshole. And I'm not bending over taking this
18 for you guys anymore."?
19    A. Yes.
20    Q. Those allegations that I read to you,
21 would you agree with me that they're sexual in
22 nature?
23    A. They are.
24    Q. Okay. Are they alarming at all?
25    A. Absolutely.

Page 114

1    Q. Are they alarming -- I know that we'd
2 previously spoken about, you know, a supervisor
3 making comments.
4    Is it alarming to you that a lieutenant is
5 making these comments?
6    A. Sure. That would be unacceptable.
7    Q. Okay. Do you know how this case against
8 Ms. Dominguez was started?
9    A. I believe if I could read from the
10 beginning?
11    Q. Of course.
12    A. I believe staff members were complaining
13 to the fair employment practice individual.
14 Yes. That's what it was.
15    Q. What's her name?
16    A. He Efran Kelly.
17    Q. Okay.
18    A. She received an anonymous complaint in
19 the form of a letter.
20    Q. So -- and just so I understand, it
21 generally -- and I know we really beating a dead
22 horse on Mr. Fulford's termination of probation.
23    If someone was in a position for over a
24 year -- meaning, they had already made their
25 probation, can it still be recommended that they

Page 115

1 be demoted, administratively, or with
2 discipline?
3    A. No. Sorry. It cannot be done
4 administratively. It has to be done through a
5 disciplinary --
6    Q. Okay. Understood.
7    So do you know if -- well, we spoke about the
8 concern -- again, from the supervisor
9 position -- and why was there no recommendation
10 for a demotion for Ms. Dominguez?
11    A. I would have to see what the
12 recommendation was and -- what you read were the
13 allegations. What the actual findings were
14 also. So it's not just the allegations. It was
15 sustained.
16    Q. Certainly. And by the three person
17 panel?
18    A. Yeah. And in the end. Yes.
19    Q. I just want to go through some of the
20 allegations.
21    Can you read this paragraph for me?
22    A. It stated that on occasions and openly
23 Lieutenant Dominguez grabbed her breast and
24 indicated that her breast was something that
25 they -- the officers did not have. Lieutenant

Page 116

1 Dominguez stated that she was more capable in
2 getting things done than a man.
3    Q. Would you characterize that as something
4 sexual?
5    A. I think it's totally inappropriate.
6    Q. But is it sexual?
7    A. There are connotations of grabbing her
8 breast. That's sexual connotations.
9    Q. And that would be inappropriate in the
10 work place?
11    A. Absolutely. It's inappropriate.
12    Q. Read those two paragraphs for me, please.
13    A. Just the underlined part?
14    Q. You can just read this first paragraph.
15    A. This one?
16    Q. This one where Corporal Max stated that
17 --
18    A. Okay. Corporal Max stated that --
19    Q. And just a little slower for the court
20 report.
21    A. Corporal Max stated that Lieutenant
22 Dominguez did not make any personal, sexual
23 comment to her. However, Lieutenant Dominguez
24 had sexual discussions with her secretary, Marta
25 Alvarez (phonetic). Sometimes Corporal Max



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
117–120

Page 117

1 would hear them talking while she was in her
2 office.  Corporal Max stated that during a
3 command staff meeting last year, Lieutenant
4 Dominguez made an inappropriate comment about
5 having something put up her ass -- later and in
6 presence Corporal stated and told Lieutenant
7 Dominguez that her comment was inappropriate.
8 Lieutenant Dominguez stated that she did not
9 recall making any inappropriate statements, and
10 if she did, she was sorry.
11    Q.  Would you agree with me that those
12 comments are sexual in nature?
13    A.  They're inappropriate.  Yes.
14    Q.  But they're sexual in nature?
15    A.  Well, if you're having someone put
16 something up your butt, yes.
17    Q.  And what about having sexual discussions
18 with Secretary Marta Alvarez?
19    A.  Yes.  It's sexual discussion.  It's
20 sexual.
21    Q.  And you would agree that's inappropriate,
22 correct?
23    A.  Yes, it is.
24    Q.  Is this similar to some of the
25 allegations or some of the witness testimony

Page 118

1 with regard to Mr. Fulford, where witnesses --
2 for example, Frasier.  I think we spoke about.
3    Didn't hear any comments, but supposedly
4 witnessed something?
5    A.  Yes.
6    Q.  Okay.  Read this last paragraph for me.
7    A.  Lieutenant Dominguez has not made any
8 personal, sexual comments or displayed any
9 sexual gestures to Officer Haines (phonetic).
10 Officer Haines has observed Lieutenant Dominguez
11 grab her breast and tell her male officers, I
12 can do that because I've got these, or this is
13 what I breast feed by kids with.
14    Officer Haines did not recall any specific
15 dates.  Officer Haines stated that this type of
16 behavior happened more than once.
17    Q.  Would you agree that that comment is
18 sexual in nature?
19    A.  Yes.
20    Q.  And similar to the allegations against
21 Mr. Fulford, where people testified that -- or
22 made witness statements that no comments were
23 made to them.  The same thing is happening here,
24 correct?
25    A.  Yes.

Page 119

1    Q.  And the same thing about someone making
2 an observation is present here is similar to how
3 it was with Mr. Fulford, correct?
4    A.  Yes.
5    Q.  Read this to yourself, because this is a
6 long paragraph.
7    Could you read the first paragraph on this
8 page.  I think it's page 15, correct?
9    A.  Page 15.
10    Just this top paragraph?
11    Q.  Yes.
12    A.  Okay.
13    Q.  Did you see the portion of this paragraph
14 where at a staff meeting Lieutenant Dominguez
15 said "I'll fight for y'all.  But they had my ass
16 spread this wide defending you all."  She --
17 Lieutenant Dominguez used her hands to indicate
18 how wide?
19    A.  Yes.
20    Q.  Is that sexual in nature?
21    A.  It's inappropriate.
22    Q.  Is it sexual in nature?
23    A.  Yes.  It's inappropriate.  It's sexual in
24 nature because it's dealing with the that.  Yes.
25    Q.  Understood.  What about the allegation

Page 120

1 here from Officers Haines, where it's indicated
2 that there was a complaint filed against
3 Lieutenant Dominguez for a hostile work
4 environment.  But nobody ever informed of the
5 outcome of the case?
6    Does that concern you?
7    A.  Not necessarily, because any allegations
8 that were made would've been looked at.  And
9 when this case came there was no sustained prior
10 allegation.  So Lieutenant Dominguez is very
11 stern.  She writes a lot of folks up.  So
12 individuals came out and wanted her out of the
13 unit as well.
14    Q.  Is it fair to say that people in that
15 unit, meaning, employees were a bit intimidated
16 or afraid of Lieutenant Dominguez?
17    A.  You would have to ask them.  I can't
18 answer for them.  If there were no prior
19 allegations sustained prior to this case
20 regarding that.
21    Q.  Were it says Lieutenant Dominguez has
22 more rank than she does.  Due to that rank she
23 could make decisions regarding her performance
24 evaluations and discipline.  Therefore, Officer
25 Haines, "let it go, because nothing is done when



MARYDELL GUEVARA                                         August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                                    121–124

Page 121

1 you make a complaint against her."
2    Is that evidence that there is at least one
3 officer who is afraid of Lieutenant Dominguez?
4    A. I think you can make that case for a lot
5 of folks regarding supervisors.  Many times
6 individual say they won't say anything, because
7 they're scared of retaliation.  But obviously
8 there was a problem.
9    Q. So you can read this second paragraph to
10 yourself.
11    A. To myself?
12    Q. Yes.  Have you had an opportunity to read
13 that paragraph?
14    A. Yes.
15    Q. Did you see the part that it states
16 approximately two or three months prior to
17 Lieutenant Dominguez's reassignment during staff
18 meeting mentioned to the officer, that she went
19 to headquarters for a meeting.  Officer Luben
20 (phonetic) stated: "She said I got bent
21 backwards and fucked in the ass for you guys.
22 And you guys don't appreciate shit that I do."
23    And somewhere towards the end she said:  "I
24 got more ball than my balls is that big."  To
25 that extent.  Is that sexual in nature?

Page 122

1    A. Yes.
2    Q. Is that sexual in nature?
3    A. Yes.
4    Q. Can you read the next paragraph for me?
5    A. Out loud.
6    Q. No, to yourself.
7    A. Okay.
8    Q. So that states that staff from both the
9 6:00 a.m. to the 2:00 p.m. and the 4:00 p.m.
10 until the 2:00 a.m. were present.  The female
11 officers had a look of disgust  on their face.
12 Officer Luben stated, he felt uncomfortable, but
13 did not say anything, because he feared being
14 retaliated against, or being on Lieutenant
15 Dominguez's hit list again.  You saw that?
16    A. Yes.
17    Q. The female officers had a look of disgust
18 on their face.
19    Is that similar to the case with
20 Ms. Christian, where Frasier said that
21 Ms. Christian had a look of disgust on her face
22 after talking to Mr. Fulford; is that correct?
23    A. Yes.
24    Q. So do you see this where it says Officer
25 Luster often observed Lieutenant Dominguez

Page 123

1 hugging, pinching and squeezing Officer
2 Hernandez in front of staff?
3    A. Yes.
4    Q. Is touching, hugging, pinching someone --
5 to that person it may or may not be
6 inappropriate, correct?
7    A. Correct.
8    Q. However, that type of behavior may be
9 offensive or inappropriate to someone else
10 around, correct?
11    A. Yes.  Correct.
12    Q. To yourself, if you don't mind just
13 reading these four paragraphs.
14    A. Okay.
15    Q. So you saw the comment where Officer
16 Luster stated, that Lieutenant Dominguez said
17 something about a wide anal hole, or somebody
18 bending over and putting something in her anal
19 -- her anal hole that big?
20    A. Yes.
21    Q. That would be considered sexual in
22 nature?
23    A. Yes.
24    Q. And inappropriate?
25    A. It's inappropriate.

Page 124

1    Q. Lieutenant Dominguez also made sexual
2 overtones, as far as using the quote, "F -- fuck
3 word."  Lieutenant Dominguez made comments about
4 her breast sagging, hanging, or the "headlights
5 are on."  That would be considered sexual in
6 nature and inappropriate?
7    A. It's inappropriate.  Yes.
8    Q. Do you see -- you read this part about
9 Officer Luster -- basically, he said that he
10 was -- he felt compelled to give Lieutenant
11 Dominguez hugs?
12    A. Yes.
13    Q. And sometimes he did didn't want to, but
14 he felt compelled to.  That would be
15 inappropriate, correct?
16    A. Absolutely.
17    Q. Could you read this last paragraph?
18    A. Out loud?
19    Q. No.  Read it to yourself.
20    So that paragraph that you just read was an
21 officer recalling an incidence where Lieutenant
22 Dominguez and other female employees were joking
23 about another female employee?
24    A. Yes.
25    Q. And that would be inappropriate, correct?



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
125–128

Page 125

1   A. Yes.
2   Q. So going through all of these
3   allegations, would you agree with me that
4   there's a lot of support or witness statements
5   indicating that Lieutenant Dominguez did, in
6   fact, make sexual comments?
7   A. She made inappropriate gestures. Yes.
8   Q. What about sexual comments?
9   A. Sexual connotations that in concluded
10  genital.
11  Q. So she made sexual comments?
12  A. Yes.
13  Q. Okay. So one of the allegations that we
14  -- is -- on various occasions Lieutenant
15  Dominguez engage in unprofessional conduct by
16  open kissing, hugging, pinching and squeezing
17  Officer Hernandez and creating an uncomfortable
18  working environment for other staff?
19  A. Yes.
20  Q. That allegation was sustained by the
21  panel, correct?
22  A. Okay.
23  Q. Correct?
24  A. Yes. Yes.
25  Q. In your letter, dated July 13th, 2011 --

Page 126

1   A. Yes.
2   Q. -- to the director -- you disagreed with
3   that recommendation for sustained.
4   A. Okay.
5   Q. And stated that you recommend not
6   sustained, correct?
7   A. Is this the same?
8   Q. I don't know. I'd like to look at this
9   document. Just in case.
10  A. Yes. It says not sustained.
11  Q. And could you read that?
12  A. I did not find sufficient and, or
13  consistent fact testimony to sustain this
14  allegation. Furthermore, Officer Hernandez did
15  not make inappropriate behavior to commented to
16  him by Lieutenant Dominguez.
17  Q. So this allegation has to do with
18  creating an uncomfortable work environment for
19  staff?
20  A. Yes.
21  Q. And here you are writing that Officer
22  Hernandez denied engaging in inappropriate --
23  that he denied -- I'm sorry. I can't read that.
24  A. Any inappropriate behavior commented --
25  Q. Commented towards him by Lieutenant

Page 127

1   Dominguez. But previously we went through these
2   allegations. There was allegations of
3   inappropriate behavior?
4   A. I think regarding Officer Hernandez I
5   would have to look at everything in totality.
6   But I believe it was one person that made that
7   statement.
8   Q. And is one person saying that they're
9   uncomfortable enough for you to say that is
10  something that should not happen in the work
11  place?
12  A. If that person made it known to the
13  Lieutenant. So there's more to it. If the
14  Lieutenant -- we're a very hugging department.
15  I could walk into the facility right now, and
16  I'll hug half -- everybody that comes up and
17  says hi to me.
18  If someone were to come up to tell me hey,
19  you know, at the time -- assistant director,
20  deputy director, do not do that. That makes me
21  feel uncomfortable, I would be on notice. But
22  if everyone is coming up and hugging me and no
23  one is saying anything, I would not know it was
24  inappropriate. If one individual mentions it,
25  but never says anything, it's hard to say that

Page 128

1   she continued to do it.
2   Q. But what about in the case of Officer
3   Christian? Because she never went to IA. IA
4   went to her.
5   A. That's correct.
6   Q. So wouldn't it had been her
7   responsibility to come forward and make a
8   statement?
9   A. Not necessarily if she felt
10  uncomfortable.
11  However, in this case it wasn't that the
12  staff went. There was an anonymous letter. So
13  it was almost kind of the same thing. A staff
14  member went to IA. There was an anonymous
15  letter sent, and then the investigation spun
16  from that anonymous letter calling people in.
17  No one went directly to IA in this case either.
18  Q. So then it's similar to Mr. Fulford?
19  A. It's similar to that. Yes.
20  Q. Okay. Great.
21  A. Let me say -- it's similar in how it was
22  initiated. But the difference is, with
23  Christian, she's the one that was specifically,
24  personally, sexually harassed. And you don't
25  have that in this case. That's the difference.



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
129–132

Page 129

1    Q. Well, someone must have sent something
2  like you said to IA, to get Ms. Dominguez's
3  investigation started. So --
4    A. Yes.
5    Q. So something must've been done by
6  Lieutenant Dominguez to either someone or to
7  make someone feel uncomfortable, which prompted
8  an --
9    A. Investigation.
10   Q. -- investigation.
11   A. What I'm saying is, I forgot what the
12  person's name is, that they said they felt
13  uncomfortable, and they saw Lieutenant Dominguez
14  hugging on that officer. I forget that. If
15  that officer's came and said, you know, she
16  hugged me and she was touching me
17  inappropriately and I told her to stop, that's
18  different than someone saying I see something,
19  and it's making me feel uncomfortable, and they
20  let that person know.
21   Q. I think I understand what you're saying.
22   A. Okay.
23   Q. Correct me if I'm wrong, you're saying
24  that if someone -- that there is a difference
25  between someone being --

Page 130

1    A. The target.
2    Q. -- the target of something and someone
3  witnessing something?
4    A. Yes.
5    Q. And being a -- what I'll call a secondary
6  target?
7    A. Yes. And it's still inappropriate
8  behavior. But different levels.
9    Q. Understood. But what about -- the people
10  who are in Ms. Dominguez's case are testifying,
11  giving statements that they personally witnessed
12  and heard comments that she made in an office
13  setting --
14   A. Right.
15   Q. -- but didn't report it because they're
16  afraid of her?
17   A. Sure. And she -- you know, the comments
18  that stuck out were -- her description of her
19  getting her butt ripped, and things like that,
20  and bigger testicles. Which was -- although the
21  men felt offended -- it was in essence to males
22  and females. So I don't think she was
23  differential between men and female. I think
24  she was just trying to state that in a very
25  inappropriate and unprofessional manner.

Page 131

1    Q. But you would agree with me that if nine
2  out of ten people in a room don't feel offended
3  by those comments, but one person does, it's
4  inappropriate to say?
5    A. The comment was -- that's correct. Those
6  comments were inappropriate. I believe those
7  allegations were sustained.
8    Q. So there's a couple of separate
9  allegations that discuss a hostile work
10  environment, that separate discussed
11  unprofessional, sexual comments about her breast
12  and things of that nature.
13    Why roll all of those into one allegation?
14   A. For at administrative expediency. I
15  actually went -- I remember that I went to
16  senior legal advisor and asked him can I do
17  this if -- instead of saying -- she said my
18  balls were bigger one day or my testicles were
19  bigger than mine - or I have bigger ones than
20  yours. All of this to me was the same thing.
21  It was all inappropriate remarks. So instead of
22  saying my balls were bigger on this day, and my
23  testicles were bigger on this day. I have
24  bigger ones. Can I roll them all into one for
25  expediency, and he said yes, you can. So that

Page 132

1  is the only reason it was put together.
2    Q. But what about, like, her genitals --
3  the sexual advances and requests for sexual
4  favors?
5    Those are similar. Why not for Mr. Fulford,
6  combine those into one?
7    A. I did not see the volume of those
8  allegations in Mr. Fulford's.
9    How many allegations were hearsay? If you
10  would allow me to look at the documents to --
11   Q. Sure. There's fifteen allegations here.
12   A. And if I could look at the documents to
13  refresh --
14    I think I was just tired of continually
15  typing the same things. So I asked, and, you
16  know -- again, administrative expediency -- just
17  to merge those that were pretty much to me --
18  that were similar.
19   Q. Can you tell me -- you investigated this,
20  correct, in the same manner that it went through
21  IA, to the disposition panel, up the chain of
22  command?
23   A. The process of commands, yes.
24   Q. Can you tell me -- well, we already
25  discussed the joining of allegations together.



Case 1:15-cv-23061-KMM   Document 51-4   Entered on FLSD Docket 09/12/2016   Page 34 of 41

MARYDELL GUEVARA                                    August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                       133—136

Page 133

1   A. Yes.
2   Q. Did -- for example, with regard to
3 Mr. Fulford, there was -- I believe allegations
4 about showing some sexually suggestive photos on
5 the computer, and then using a computer --
6 inappropriately?
7   A. Inappropriately.
8   Q. Yes. So why not combine those two
9 allegations together?
10   A. I can't specifically recall. I do know
11 there was a showing of sexual pictures. And
12 there was -- I think there might have been a
13 travel drive introduced into the computer to
14 show pictures. So that would've been an
15 introduction of external device into -- an
16 external device -- there was more to -- just the
17 sexual showing.
18   If you brought a travel drive and stuck it in
19 a county computer to show your vacation folders,
20 that would still be inappropriate use of a
21 county computer.
22   Q. So we have here, displayed sexually
23 suggestive  photos on a Miami-Dade County
24 computer terminal.  And then we have
25 inappropriate -- I cannot say that word.

Page 134

1   Inappropriately used a Miami-Dade County
2 Telecommunication device by displaying sexually
3 suggestive photos.
4   If you agree that those two are similar in
5 nature, why not combine those two?
6   A. I don't know. But I know this was in
7 2009, and this was 2011. So at some point, you
8 know --
9   Q. Enough is enough?
10   A. Enough is a enough. Yes.
11   Q. Okay.
12   A. And it turns out you've just got to leave
13 it the way it is.
14   Q. Would you agree, though, that allegations
15 -- the allegations against Lieutenant Dominguez
16 came from multiple witnesses as to sexual
17 comments as we discussed?
18   A. Yes.
19   Q. So would you agree that allegations of
20 sexual conduct and comments are serious?
21   A. Yes.
22   Q. Okay. If these comments are -- if these
23 allegations are that serious, why are we rolling
24 into one -- I understand for efficiency
25 purposes. But why not give an answer to every

Page 135

1 single allegation?
2   A. Well, I think every single allegation had
3 an answer. But it was rolled on to one. So
4 basically she was found guilty of creating a
5 hostile work environment.
6   Nine of the allegations, the disposition
7 panel found  not sustained. The other ones with
8 the comments were rolled into -- they were
9 inappropriate comments and they created a
10 hostile work environment. That was the big
11 violation.
12   Q. The --
13   A. Creating a hostile work environment.
14   Q. As a result of sexual comments?
15   A. As a result of inappropriate comments.
16 Yes. Some of them were sexual, and that they
17 dealt with genital. Talking about balls and
18 breasts.
19   I think part of our struggle was there were
20 so many different variations of what she may
21 have said. So there was not one concrete to say
22 this is what's being said. Some people said I
23 heard this. No. I didn't hear that. I heard
24 something else. So there was a lot of different
25 language and gestures. So we tried to get away

Page 136

1 from specifics. Because we did not feel we
2 could go in and win on a specific, she said X,
3 Y, Z. She may have said X, Y, Z or A, B, C, or
4 which ever one she said was inappropriate and
5 created a hostile work environment.
6   Q. Understood. But similar -- similarly to
7 Mr. Fulford's case, there was witnesses who said
8 they never witnessed anything. They never heard
9 anything. And there was some witnesses who said
10 I saw Mr. Fulford, or there was one witness that
11 said I saw Mr. Fulford whisper in Officer
12 Christian's ear.
13   A. Right.
14   Q. So there's similar he said, she said with
15 regard to Mr. Fulford, that there is with regard
16 to Ms. Dominguez, correct?
17   A. No. With the difference that you had the
18 one affected individual come forward, whether
19 she went individually or not.  She testified
20 that he did X, Y, Z to me. There was a
21 sustained that he retaliated against her. There
22 was no similar retaliation found in this
23 particular case that was sustained. So you had
24 a victim, an identified victim in Mr. Fulford's
25 case. Where here, you have individuals who



Page 137

1 should not have been subjected to a hostile work
2 environment with the profanity and comments.
3    Q.  So where we're saying there's a victim in
4 Mr. Fulford's case.  And then there's people
5 that heard inappropriate comments and witnessed
6 this inappropriate behavior.  Why aren't they
7 considered victims?
8    A.  They are considered victims.  But I think
9 you'd to a much different level?
10    Q.  Well, no.  I think what's inappropriate
11 to someone is inappropriate in how they feel.
12    A.  True.
13    Q.  And that's just -- I guess, the
14 bottom line.  Like we said, if there's nine
15 people in a room that don't feel offended.  But
16 there is one person that feels offended -- What
17 was said or done is considered offensive.
18    A.  Offensive to that person.
19    Q.  And shouldn't have been said in that
20 setting?
21    A.  Absolutely.  But then you take it a step
22 further if there's someone who said this person
23 came to me and retaliated against me because I
24 did not want to engage in sexual behavior, that
25 is sexual harassment in the top degree.

Page 138

1    Q.  Was there ever any recommendation for
2 Ms. Dominguez to be disciplined by receiving a
3 demotion?
4    A.  I would have to look at what labor
5 management would've -- the basic recommendation.
6 It may have been demotion.  It mat have been
7 suspension.  I can't recall what it would've
8 been.
9    Q.  So Ms --
10      MR. STORCH:  That's the non exhibit.
11      MS. MOSELY:  Yes.  This is mine.
12 BY MR. STORCH:
13    Q.  Ms. Dominguez was recommended to receive
14 a 30-day suspension.
15 Let me ask you this question; if it is
16 established that Ms. Dominguez was recommended
17 to receive a 30-day suspension, do you think
18 that it's fair that she didn't get recommended
19 for demotion?
20    A.  Once again, I would have to look at labor
21 management recommendations.  And it would have
22 to go based on their recommendation, and then
23 the mitigating or aggravating factors.
24    Q.  When you say you have to look at labor
25 management, you would have to -- assuming that

Page 139

1 labor management recommended a 30-day
2 suspension, do you think it's too much, too
3 little of a discipline based on all of the
4 witnesses that came forward with the information
5 about Ms. Dominguez?
6    A.  Once again, labor management extends a
7 recommendation based on the sustained findings
8 of the violations. So labor management's
9 recommendation is a recommendation based on
10 other similar violations.   Just based -- just
11 the violation.  They don't get into a person's
12 professional profile, or any mitigating or
13 aggravating circumstances.  They just go
14 straightforward on -- this is a violation.
15 Let's look at the disciplinary history, and the
16 department, you know, for these violations.
17 This is the range.
18    Q.  Let me ask you this:  Does it make a
19 difference if there is three sustained
20 allegations or six sustained allegations as to
21 the punishment?
22    A.  It makes more of a difference of the
23 nature of the sustained allegations, and not the
24 quantity.  But what the allegations -- the
25 violations are.

Page 140

1    Q.  If there are more violations -- meaning,
2 sustained -- they're six sustained violations,
3 is it possible that the punishment would be
4 worse, because there is -- I understand you're
5 saying it's not about quantity, but it's about
6 the substance of the allegations.  But if there
7 is -- for example, three allegations rolled into
8 one, and then a separate investigation that has
9 three allegations, is there a difference?
10    A.  No.  It's not looked at.  That's not
11 necessarily something that discipline is going
12 to be increased or decreased.
13    Q.  So why not for everyone roll similar
14 allegations together?
15    A.  Because once again, in this particular
16 case -- in 2011, I did it for administrative
17 expediency.  You know, maybe I was drowning in
18 paperwork, or whatever.  I wouldn't do it again
19 after that case.  I just never did it again.  I
20 never would do it again.
21    Q.  Got it.  So I'm going to show you an
22 October 17th, 2001 memorandum from you to Tim
23 Ryan.  If you could take a look at it.
24      MS. MOSELY:  Let me see.
25    A.  Okay.



Case 1:15-cv-23061-KMM Document 51-4 Entered on FLSD Docket 09/12/2016 Page 36 of 41

MARYDELL GUEVARA                                August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                   141–144

Page 141

1  BY MR. STORCH:
2     Q.  I'm going to refer you to the end.
3  Sorry.  Not the actual end.
4     Well, actually the last page.  It's this
5  page.  I don't believe it is apart of it,
6  Counsel.
7     Actually it is.  Sorry.  I'm going to refer
8  you to what's Defendant's 36.
9     And in the section recommendation.
10    Could you read that for me?
11    A.  Sure.  Okay.
12    Q.  So this recommendation states that the
13  initial disciplinary action recommended
14  demotion.  It was based on disposition's panel
15  recommendation to sustain seven out of the
16  fifteen allegation.
17    Which is a number.
18    A.  Yes.
19    Q.  After further review, however, only five
20  case allegations were ultimately stained.
21  Another number.
22    A.  Yes.
23    Q.  Furthermore, these five case allegations
24  were ultimately merged into one allegation?
25    A.  Yes.

Page 142

1     Q.  So that on its face it's talking about
2  the quantity of allegations.  It had nothing to
3  do with the substance of them.
4     A.  I disagree.  When we're saying based on
5  the recommendation of seven out of fifteen,
6  that's the disposition panel.  And after further
7  review we didn't find sufficient merit.  So it
8  dropped down to five sustained.  So you're
9  talking about enough on evidence for the
10  findings.
11    Q.  Does it -- this only talks about after
12  further review -- only five allegations were
13  ultimately sustained.
14    A.  And this is after he signs off on it.  So
15  the difference here is, this would not -- the
16  only reason this came from me, is because the
17  reporting chain for Lieutenant Dominguez -- she
18  reported directly to a chief.  And that chief --
19  yeah.  That chief reported directly to me.  That
20  chief was involved in the investigation and
21  couldn't do this.
22    Q.  Understood.
23    A.  So I ended up having to do this.
24    Q.  Understood.  My point is that we're
25  talking about the quantity of the allegations.

Page 143

1     A.  And I don't see it as quantity.  My thing
2  is there were seven sustained, and now there's
3  five.
4     Q.  And all of them were rolled into one,
5  correct?
6     A.  All of them were rolled into one.
7     Q.  And ultimately a recommendation was made
8  for a five day suspension for Ms. Dominguez; is
9  that correct?
10    Is that amount of days of suspension more or
11  less than the recommended suspension for
12  Mr. Fulford?
13    A.  Less.
14    Q.  I'm almost done.  Let's take a break.
15        (OFF THE RECORD AT 5:03 P.M.)
16        (BACK ON THE RECORD AT 5:10 P.M.)
17  BY MR. STORCH:
18    Q.  So after Mr. Fulford received or --
19  strike that.
20    Mr. Fulford began or continued receiving
21  exemplary evaluations -- through the time of the
22  allegations and then afterwards -- are you
23  familiar with that?
24    A.  No.  But I'll take your word for it.
25    Q.  Okay.  Only after this alleged

Page 144

1  incident -- I'm just going to close the door.
2  Only after the alleged allegations that were
3  made against Mr. Fulford, did he receive written
4  reprimands?
5     Are you familiar with that?
6     A.  Not off the top of my head.  No, sir.
7     Q.  Okay.  What is the first level of
8  discipline?
9     A.  Actually, written reprimands is the first
10  level of discipline.
11    Q.  So Mr. Fulford doesn't receive any
12  written reprimand throughout his entire
13  employment up and through -- I believe, it was
14  even through the time of these allegations.  And
15  then all of sudden -- I believe it was sometime
16  in 2012, Officer Christian makes some sort of
17  allegations against Mr. Fulford again.
18    Are you familiar with this?
19    A.  Keep going.  You might get my memory
20  going.
21    Q.  Something about Mr. Fulford referring to
22  Ms. Christian as the devil?
23    A.  Okay.
24    Q.  Familiar?
25    A.  Yeah.  Yes.



Case 1:15-cv-23061-KMM Document 51-4 Entered on FLSD Docket 09/12/2016 Page 37 of 41

MARYDELL GUEVARA                          August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                      145–148

Page 145
1   Q.  Could you tell me what do you recall
2  about that?
3   A.  Just what you said.
4   Q.  Were you involved in any investigation as
5  that goes?
6   A.  I'm trying to remember.  I know it was
7  something about -- I don't know if Mr. Fulford
8  was working back at the jail -- went to the
9  jail, and they crossed paths or something.  And
10  Mr. Christian made an allegation.  And I don't
11  know if it was investigated or not.  So -- you
12  know, if it was investigated, it would've come
13  to me.  And I think at one point I actually --
14  either not sustained something that they tried
15  to sustained.  I know I took some action on
16  Mr. Fulford's behalf.  I didn't find sufficient
17  evidence in what was initially provided.  If I
18  can take the look at it, I might -- it might
19  recollect -- but I do remember something like
20  that in trying to push something, and I did not
21  agree with it.  It was in his favor, actually.
22   Q.  In going through that investigation, are
23  you -- or is someone allowed to use prior
24  complaints as evidence against someone?
25   A.  Not necessarily evidence.  But if there's

Page 146
1  a similar complaint that's sustained previous to
2  the one that's being looked at, it may act as an
3  aggravator.
4   Q.  Understood.  But -- so in this case,
5  where it was alleged that he called this officer
6  a devil --
7   A.  Uh-huh.
8   Q.  -- that would not have anything to do
9  with the prior sexual allegations?
10   A.  No.  Just -- if she's complaining, and
11  she was found to be credible before -- if he was
12  found to not to be credible.  That not be looked
13  at in the investigative portion.  That would be
14  looked at by -- maybe the disposition panel and
15  later on for discipline.
16   Q.  Understood.
17   A.  Credibility.
18   Q.  Got it.  Was it troubling that the same
19  person was -- that previously complained about
20  Mr. Fulford was complaining again about
21  Mr. Fulford?
22   A.  Was it troubling?  In what sense?
23   Q.  In the sense that it's obvious that there
24  was an issue, one way or another beforehand.
25  That someone had a problem with the other one.

Page 147
1  And it could go both ways.  It could be
2  Ms. Christian, you know, complained about
3  Mr. Fulford.  And she's upset.  And Mr. Fulford
4  is upset, because he doesn't believe the
5  allegations to be true.  So upset going both
6  ways.
7   A.  Right.
8   Q.  Is it troubling at all that these two
9  individuals are now having another incident when
10  there's potential animosity from a prior
11  incident?
12   A.  I mine that's always an issue.  But
13  remember the first case, Christian didn't go to
14  IA.  So that makes it more troubling.
15   Q.  Was Mr. Fulford put back into a position
16  where Ms. Christian was working?
17   A.  I don't know if he was there permanently
18  or working that particular day.  Again, it's
19  been a little while.  But you cannot --
20  you know, in a professional environment you
21  would hope that individuals are going to act
22  professionally.  There are times where if there
23  is some animosity, that we separate folks for a
24  period of 30 days.  You know, speak to them and
25  try to do mediation.  Depending on circumstances

Page 148
1  or once somebody's been disciplined -- okay.
2  That should correct prior behavior.  But you
3  can't keep people separate for the rest of their
4  career.  You would hope that individuals come
5  together and be professional.
6   Q.  Understood.  In terms of sergeant and
7  corporal, there's a pretty decent pay
8  difference; is that correct?
9   A.  There is.
10   Q.  And in term of progressing and getting
11  salary increases and bonuses, if there are any,
12  that is different -- greater at the sergeant
13  level, than it would be at the corporal level?
14   A.  The opportunities are the same for any
15  increase in salary.
16   Q.  But you would be making less money even
17  with that same increase as a corporal --
18   A.  Yeah.  The salaries are different.  The
19  opportunities are the same.
20   Q.  What is the cap for salary at the
21  corporal, if you know?
22   A.  I have no clue, sir.
23   Q.  Same thing for the sergeant level?
24   A.  None at all.
25   Q.  Are you aware that Mr. Fulford went to



MARYDELL GUEVARA                               August 05, 2016
FULFORD vs. MIAMI-DADE COUNTY                   149–152

Page 149

1 the EOC and complained of gender discrimination,
2 as well as retaliation?
3   A.  Yes.
4   Q.  Do you know what the EOC found as it
5 relates to these allegations?
6   A.  No.  It was never presented officially to
7 me.
8   Q.  The EOC actually found that there was --
9 they found cause that there was a -- that
10 discrimination against Mr. Fulford did take
11 place.  That specifically based on his gender he
12 was treated differently.  Worse.
13   Are you -- I assume that you disagree with
14 that?
15     MS. MOSELY:  Objection.  Form.  You can
16 answer.
17   A.  Absolutely.
18 BY MR. STORCH:
19   Q.  Just give me two minutes with
20 Mr. Fulford.
21     (OFF THE RECORD AT 5:21 P.M.)
22     (BACK ON THE RECORD AT 5:25 P.M.)
23 BY MR. STORCH:
24   Q.  Okay.  When we were talking about the
25 devil comment --

Page 150

1   A.  Uh-huh.
2   Q.  -- Being made -- when you had mentioned
3 that you recall that you may have done something
4 for Sergeant -- or Mr. Fulford.
5   A.  Uh-huh.
6   Q.  What was done?  Because he ultimately
7 received a DAR.
8   A.  Uh-huh.
9   Q.  -- the sustained the allegations.
10   A.  I don't know if it was -- I would have to
11 look at the recommended level of discipline in
12 the case.  Because -- I know -- I don't know if
13 they had initially tried to sustain something
14 that they disagreed with, or they wanted to
15 issue a higher level of discipline.
16   I don't know.  I did find that it was
17 just not appropriate for initially what they
18 were willing to do.
19   Q.  And we also talked a little bit -- when
20 we were talking about these comments, that there
21 would be no reason to bring up the prior case,
22 because it was completely unrelated to the
23 allegations of this investigation?
24   A.  Right.  The reviewing folks actually
25 would look at it.  It would be when you get

Page 151

1 someone's file, and they identify if there's
2 been a prior sustained allegation that they
3 could take that into consideration as -- again,
4 a mitigating or an aggravating.
5   Q.  Because in the investigation -- the
6 investigator notes that Officer Christian filed
7 a complaint of sexual harassment against
8 Sergeant Fulford, which was assigned to Sergeant
9 Boom for investigation.  But that had no reason
10 to be in there, because there was no reason --
11 it specifically states here that it was sexual
12 harassment, which is completely different than
13 calling someone you know, the devil.
14   A.  Right.  I guess it gives you reason as to
15 what would've motivated him to make that
16 comment.
17   Q.  So then, it would seem to me that putting
18 that in there could only be harmful to
19 Mr. Fulford?
20   A.  It's a fact that it was in there, and as
21 to whether the panel can take it into
22 consideration.
23   Q.  Is there anyway with that being in the
24 investigation, that that can be taken in a
25 positive way for Mr. Fulford?

Page 152

1   A.  No.  But it's just a fact.
2   Q.  Also, where it says Officer Christian
3 filed a complaint of sexual harassment --
4   A.  Uh-huh.
5   Q.  -- that's not accurate based on Officer
6 Christian's testimony; is that correct?
7   A.  Meaning?
8   Q.  She didn't file a complaint, and that IA
9 --
10   A.  No.  There was --
11     MS. MOSELY:  Objection to the form.  You
12 can answer.
13   A.  There was a complaint about sexual
14 harassment regarding Officer Christian.  She did
15 not initiate it. But there was a sexual
16 harassment complaint.  Saying that she filed it
17 actually works against her.  You would think,
18 okay.  She files this, and now she's filing
19 something else.  It's kind of like the scenario
20 you were saying.  She keeps doing this, because
21 she wants to make this guy's life miserable or
22 what --
23   Q.  But that would only be the case if the
24 allegations were not sustained.  Meaning, the
25 complaint that she filed -- even though she



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
153–156

Page 153

1 didn't file one with allegations against
2 Mr. Fulford -- if those were investigated and
3 found to have no merit, and then she filed
4 another complaint, then would you agree with me
5 that that would be the scenario where it would
6 be against Officer Christian?
7    A. I could see both ways. I guess -- again,
8 that's a fact. The way they put in there --
9 there was a fact that it was sexual harassment.
10 A prior case. That's all it is. It's stating a
11 fact.
12    Q. And saying that -- it's not in anyway
13 helpful, is it, to Mr. Fulford?
14    A. I don't think it's helpful or harmful.
15 It's just a fact.
16    Q. Got it. Do you know how Mr. Fulford is
17 treated now at work?
18    A. I don't. I know he has said he's not
19 treated -- that people look at him funny. I
20 don't know personally.
21    Q. Someone looking at someone funny; isn't
22 that kind of similar to someone looking at
23 someone -- like, we were talking with Officer
24 Christian, in her complaint; isn't that similar?
25    A. Okay. You totally lost me on that. I'm

Page 154

1 sorry.
2    Q. So Officer -- if Mr. Fulford is saying
3 that people are looking at him funny, and
4 wouldn't that be the same as the look on
5 someone's face after a comment was made?
6 Because if people are looking at someone in a
7 different way?
8    A. I don't quite see how that -- I'm not
9 sure what you are asking -- to be honest.
10    Q. Okay. That's fine.
11    A. I'm not sure.
12    Q. Okay. That's fine. Not a problem.
13 Do you have any reason to believe that
14 Mr. Fulford is lying when he says that he's
15 being treated differently?
16    A. I have no reason to believe he's lying.
17    Q. I have no further questions.
18       MS. MOSELY: I have a few questions.
19          CROSS EXAMINATION
20 BY MS. MOSELY:
21    Q. Ms. Guevara, when did you retire from the
22 County?
23    A. May 31st of 2016.
24    Q. Do you have any firsthand knowledge about
25 how Mr. Fulford is treated at work today?

Page 155

1    A. No. I do not.
2    Q. You were asked some questions concerning
3 a document that I don't believe you were shown.
4 But it was pertaining to the transfer of
5 Ms. Dominguez for a sexual harassment
6 allegation.
7 Can you tell me what rank is Ms. Dominguez?
8    A. She's a lieutenant.
9    Q. And she was a lieutenant at the time of
10 the transfer?
11    A. Yes, ma'am.
12    Q. Is there any reason that a lieutenant
13 might not be restricted to a particular shift in
14 a transfer memo?
15    A. Giving it some thought, that language
16 restricting a lieutenant to a specific
17 assignment would not be included, because a
18 lieutenant can only work the assignment they're
19 assigned, compared to a sergeant, corporal,
20 officer, they can work various assignments on
21 overtime. Lieutenants cannot work overtime. So
22 a lieutenant would not be able to work anywhere
23 but the assigned location.
24    Q. Okay. And so what would be the reason
25 that the shift restriction would be included in

Page 156

1 Officer Fulford's memo?
2    A. Location or shift or specific
3 restrictions would be to make sure that
4 everybody understood that he could not be hired
5 to work any other location -- as specified in
6 the transfer.
7    Q. You were shown a transcript from an
8 arbitration. I don't think that was marked as
9 an exhibit.
10 But you were asked about the testimony of
11 Officer Christian.
12 Just to be clear, were you present at the
13 arbitration in this matter?
14    A. No. Not for her testimony, no.
15    Q. And the testimony that you read from, was
16 that your testimony?
17    A. No. That was not.
18    Q. Okay. That was testimony of whom?
19    A. I believe Officer Christian.
20    Q. Okay. And when you were asked questions
21 while you were being shown that document, you
22 were answering, essentially, what the document
23 said, correct?
24    A. Yes, ma'am.
25    Q. Okay. Do you have any firsthand



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
157–160

Page 157

1 knowledge about what took place at that
2 arbitration?
3    A.  No, ma'am.
4    Q.  And I believe your memorandum, which is
5 Exhibit No. 2.  That memo is dated September
6 4th, 2009?
7    A.  Yes, ma'am.
8    Q.  The arbitration concerning Mr. Fulford,
9 did that arbitration happen before or after your
10 memo?
11    A.  The arbitration happened after my memo.
12    Q.  Okay.  I don't have anything else.
13       MR. STORCH:  I just are have a follow-up.
14          REDIRECT EXAMINATION
15 BY MR. STORCH:
16    Q.  With regard to the restriction to
17 Mr. Fulford, the restriction to a specific
18 building -- and restricting Mr. Fulford to a
19 specifically building -- that would have meant
20 that he wasn't going to come in contact with
21 Officer Christian -- at least until the
22 investigation was done, correct?
23    A.  That's correct.
24    Q.  But prior to the allegations, which would
25 be prior to the transfer.  Was Mr. Fulford able

Page 158

1 to work overtime?
2    A.  I -- I'm not aware of any restrictions.
3    Q.  Subsequent to his transfer where he was
4 told that he was only limited to a specific
5 shift -- was Mr. Fulford able to work overtime?
6    A.  I don't know.  But limited to a certain
7 shift or location?
8    Can I look at the transfer order?
9    Q.  So reading the March 26th, 2009 document
10 that you drafted, would you agree that
11 Mr. Fulford was limited to a specific location,
12 as well as a specific shift?
13    A.  List of assignment -- no.  He could still
14 work different shifts.  And he could definitely
15 work on his days off on that shift.  It refers
16 more to the actual location than the shift.
17    Q.  How --
18    A.  I'm sorry.
19    Q.  Could you read this highlighted line for
20 me?
21    A.  Until further notice Sergeant Fulford is
22 restricted to the listed assignment.
23    Q.  So that would mean that he's restricted
24 to the assignment in this memorandum, correct?
25    A.  Yes.

Page 159

1    Q.  No further questions.
2       MS. MOSELY:  I don't have anything else.
3 Thank you.
4       MR. STORCH:  I assume you guys are
5 reading?
6       MS. MOSELY:  Yes.  We are reading.
7       MR. STORCH:  I'm not ordering.
8       MS. MOSELY:  Actually, I'll let you know.
9 I'll take a copy if it's ordered.
10          ****************
11
12
13
14
15
16
17
18
19
20
21
22
23
24 (Reading and signing of the deposition was
25 waived by the witness and all parties.)

Page 160

1             CERTIFICATE OF OATH
2
3
4 STATE OF FLORIDA
5 COUNTY OF DADE
6
7
8
9       I, Stacy A. Boffman, Florida Reporter,
10 Notary Public, State of Florida, certify that
11 MARYDELL GUEVARA personally appeared before me
12 on the 5th day of August, 2016, and was duly
13 sworn.
14
15
16
17
18    Signed this 19th day of August, 2016
19
20
21    _____
22    Stacy A. Boffman
   Notary Public, State of Florida
23    Commission No.1037789
   Commission Expires: February 12, 2017
24
25



MARYDELL GUEVARA
FULFORD vs. MIAMI-DADE COUNTY

August 05, 2016
161

Page 161

```
 1              CERTIFICATE OF REPORTER
 2
 3   STATE OF FLORIDA
 4   COUNTY OF DADE
 5
 6        I, STACY A. BOFFMAN, Florida Reporter,
 7   certify that I was authorized to and did
 8   stenographically report the deposition of
 9   MARYDELL GUEVARA, pages 1 through 159; that a
10   review of the transcript was not requested; and
11   that the transcript is a true record of my
12   stenographic notes.
13
14        I further certify that I am not a
15   relative, employee, attorney, or counsel of any
16   of the parties, nor am I a relative or employee
17   of any of the parties' attorneys or counsel
18   connected with the action, nor am I financially
19   interested in the action.
20        Dated this 19th day of August 2016.
21
22
23   _____
24        Stacy A. Boffman
          Florida Reporter
25
```

